**AMERICAN HORSE PROTECTION ASSOCIATION, INC., et al., Plaintiffs,**

v.

**Cecil ANDRUS et al., Defendants.**

**Civ. No. R–78–105BRT.**

United States District Court,
D. Nevada.

Sept. 15, 1978.

McCandless & Barrett, Robert C. McCandless, David M. Barrett and Russell J. Gaspar, Washington, D.C., for American.

Murdaugh Stuart Madden and Roger A. Kindler, Washington, D.C., for Humane Soc.

B. Mahlon Brown, U. S. Atty., Dist. of Nevada, Reno, Nev., Walter J. Postula, Atty., Dept. of Justice, Washington, D.C., for defendants.

BRUCE R. THOMPSON, District Judge.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

This is an action brought by American Horse Protection Association, Inc. and the Humane Society of the United States against the Secretary of the Interior and subordinate officials for declaratory and injunctive relief concerning the administration in Nevada of the Wild Horses and Burros Act adopted by the Congress on December 15, 1971.

The Court held an evidentiary hearing on plaintiffs' motion for a preliminary injunction on July 27th and 28th. The motion sought to enjoin defendants from implementing their announced plans to remove wild, free roaming horses from federal public lands in four Nevada grazing districts. Plaintiffs contend that the round-up proposals are violative of the National Environmental Policy Act in that defendants unreasonably determined that the round-ups will not have significant environmental effects and are violative of the Wild Free-Roaming Horses and Burros Act in that the round-ups are being planned without adequate information, in a manner that is not the minimum feasible level of management of wild horses, and without a proper consideration of alternatives. Defendants' cruel and inhumane operation of a wild horse holding facility at Palomino Valley, Nevada is also challenged as violative of the Wild Horses Act.

The Congressional Reports which led to the passage of the Wild Free-Roaming Horses and Burros Act stated, in part:

"We believe that a comprehensive wild horse and burro management program can no longer be deferred. Consistent with sound management practice, no such program should be undertaken that does not (1) provide for the protection and preservation of healthy animals and (2) help to maintain a viable balance between the numbers of animals protected and the continued availability of suitable habitat. The number of nonpermitted free-roaming horses, found mainly in Nevada, Oregon, and Wyoming, has remained relatively stable at 17,000. Of this total, it is estimated that 7,500 are branded or probably will be claimed by private owners, leaving about 9,500 unclaimed free-roaming horses. However, the number of unclaimed free-roaming burros, now at 10,000, has continued to grow in the areas of Arizona and California where they are most often found. Our responsibility for management of wildlife on the public lands requires that we give consideration to the needs of all species, including some now threatened with extinction."

(Letter of Secretary of Interior dated April 16, 1971.)

"Reliance on ranges, and particularly fenced ranges, would defeat the purpose of the legislation, i. e., the survival of wild free-roaming horses and burros, and substitute a 'zoo-like' concept. The conferees are of the opinion that the confinement of these animals to such ranges, except in unusual circumstances, should be discouraged and that the animals should be considered as integral parts of the public lands, which should be administered on concepts of multiple use. The principal goal of this legislation is to provide for the protection of the animals from death and harassment at the hands of man and not the single-use management of areas for the benefit of the wild free-roaming horses and burros. Hence, the inclusion of the phrase 'in keeping with the multiple-use management concept for the public lands.'"

(Joint Statement of the Committee of Conference).

"The Senate version of the bill authorizes and directs the Secretary to undertake studies of the habits of the animals. The House amendment does not. The Committee of Conference agreed to the adoption of the Senate language in light of the apparent lack of adequate knowledge regarding many of the habits of these animals.

"It is the opinion of the conferees that the compromise version of this legislation as embodied in the conference report will prove to be an effective measure. It should be pointed out that the Secretaries of Interior and Agriculture are given a high degree of discretionary authority for the purposes of protection, management, and control of wild free-roaming horses and burros on the public lands. The Act provides the administrative tools for protection of the animals from depredation by man. This is the paramount responsibility with which the Secretaries are charged under the terms of the statute.

"The Congress has declared that wild free-roaming horses and burros enrich the lives of the American people. The conferees, by recommending the language of the conference report, hope to insure the preservation and protection of the few remaining wild free-roaming horses and burros in order to enhance and enrich the dreams and enjoyment of future generations of Americans."

(Joint Statement) (Vol. 2, U.S.Code Congressional and Administrative News, 92nd Congress, First Session 1971, p. 2149 et seq.).

The State of Nevada, comprising approximately 110,000 square miles, has been divided administratively by the Bureau of Land Management of the Department of the Interior into six grazing districts, each roughly equal in size (see maps attached to Environmental Assessment Records, for example, Exhibit 6). There are six proposed horse round-ups involved in the motion for a preliminary injunction.

1. *The Paradise-Denio Resource Area* (Exhibit 1) in the Winnemucca District involves mountain range lands in the Krum Hills, Bloody Run Hills, Hot Spring Range and Osgood Mountains. In 1977 approximately 800 horses were counted in this area. As shown by Exhibit 18 this area is actually five separate horse ranges, the horse counts in each area being as follows: 228, 206, 123, 229 and 13, but, as disclosed by the map (Figure 1, Exhibit 1) were treated as one area for purposes of the Environmental Assessment Record. The assessment included 704,000 acres of public lands administered by the BLM in a grazing district which encompasses 8,253,000 acres of public lands so managed. The area lies on both sides of the City of Winnemucca, Nevada extending roughly 30 miles in an east-west direction and 20 miles north from Winnemucca. The Winnemucca Grazing District occupies an area approximately 140 miles north-south and 120 miles east-west. The Paradise-Denio area is a checkerboard area (caused by congressional grants of alternate sections for the aid of railroads) and 65% is in public ownership and 35% privately owned.

2. *The East Range* (Exhibit 2) is southwest of Winnemucca comprising 577,375 acres, 73% public lands and 27% privately owned—another checkerboard area. It is one integrated horse range about 40 miles long (N–S) and 20 miles wide. The 1977 count identified 1,093 horses on the range.

3. *The Stone Cabin and Reveille Grazing Allotments* in the Tonopah Resource Area of the Battle Mountain Grazing District are adjacent to each other and to the northern boundary of Nellis Airforce Base. The area is roughly fifty miles square. The entire Battle Mountain District is roughly 200 miles (N–S) and 100 miles (E–W). The horses were counted in 1978. It is planned by round-up to reduce the 785 head of horses to 185 head and thereafter to permit a fluctuation between 185 and 320 head in the Stone Cabin area. It is planned to reduce the 690 head of horses in the Reveille area to 175 head and thereafter to permit fluctuation between 175 and 225 head of horses.

4. *Flanigan Management Area.* This area is approximately fifty miles north of Reno, Nevada. There are six separate small herds of horses in the area. It is planned to establish an intensive wild horse management situs in the Flanigan Allotment for approximately 100 head and to remove all but about 75 head for a starter, a round-up of about 210 head. The present six scattered small herds range in an area approximately twenty miles square in the Carson City Grazing District which encompasses approximately five and one-half million acres managed by the BLM.

5. *Horse Mountain Area.* This, too, is in the Carson City Grazing District about seventeen miles southwest of Fallon, Nevada. The approximately 35,000 acres of federal range carry an estimated 65 to 80 head of horses. The plan is to reduce the horse herd to the 1971 level of approximately 27 head.

6. *Monte Cristo Area* is in the Egan Resource Area of the Ely Grazing District. The Ely Grazing District encompasses eight million acres of public lands administered by the BLM. It is roughly 100 miles in width and 150 miles in length (N–S). The

Monte Cristo area includes 228,000 acres of BLM and National Forest lands. It is estimated that there were 71 horses in the area in 1971 and these had increased to 141 by 1975 when a count was made. The 1978 count disclosed 188 head (Exhibit 18). The range is approximately 40 miles long (N–S) and 20 miles wide. The plan is to round-up and remove approximately 55 wild horses from this area.

With respect to each of the six areas listed, defendants produced an Environmental Assessment Record. These are in evidence (Exhibits 1–6). While they are not offered as complete environmental impact statements under NEPA, and do not all cover the same subject matters in the same detail, each of them demonstrates a sincere effort by the officials of the Bureau of Land Management to bring together the significant data bearing upon a decision with respect to whether numbers of wild horses should be rounded up and disposed of as authorized by the Wild Horses and Burros Act, 16 U.S.C. § 1333(b). Each of the areas in question has been found by the BLM officials to be overpopulated with wild horses in the light of all pertinent conditions and considerations. In each instance it was concluded that an environmental impact statement under NEPA need not be prepared. In at least one instance the reason stated was that the action to be taken was not *significant* federal action within the contemplation of the National Environmental Protection Act.

■ Plaintiffs contend that inasmuch as the grazing district is the principal BLM administrative unit, it is appropriate "for defendants to prepare district-wide environmental impact statements concerning their wild horse round-up programs." In our prefatory statement we have taken considerable trouble to demonstrate the immense size of these six grazing districts in relation to the relatively small area of the wild horse ranges.

The uncontradicted evidence is that the wild horse herds do not normally migrate and that they customarily range in one locality a distance of five to ten miles or so.

The uncontradicted evidence is that no two herd areas are alike. Availability of water and forage are different. The demands of the recognized uses under the multiple use concept are different, the terrain and procedures for capturing excess wild horses are different. In sum, a study which would attempt to assess the impact of wild horse removal on a district-wide basis would be useless. The differences are evident from the Environmental Assessment Records in evidence.

Further, to direct the preparation of an environmental impact statement for each of the six Nevada grazing districts would impinge upon the jurisdiction of a sister court. In *Natural Resources Defense Council, Inc. v. Morton,* 388 F.Supp. 829 (D.C.1974) aff. 174 U.S.App.D.C. 77, 527 F.2d 1386 (D.C. Cir. 1975), the court dealt with a contention that NEPA requires the BLM to prepare, publicly circulate and consider environmental impact statements which satisfy the National Environmental Policy Act in all respects and which discuss in detail the environmental effects of the proposed livestock grazing, and alternatives thereto. The court so ordered, and found that the issuance of grazing permits to cattlemen and sheepmen in the public land states was "major federal action significantly affecting the quality of the human environment." The final judgment was entered in that case on June 18, 1975 and set up a timetable for compliance by the preparation of 212 Allotment Management Plans, the final of such environmental impact statements (EIS's) to be completed by 1988. On April 14, 1978, the court entered an amended final judgment modifying the time schedule. The court continues to retain jurisdiction.

That court which has jurisdiction of BLM's compliance with NEPA throughout the public land states did not see each federal grazing district as an appropriate unit for an EIS. On the contrary, in Nevada the agreement incorporated by reference in the final judgment identifies 14 different environmental statement areas with completion dates commencing in September, 1979 and

ending in September, 1988. In other words, it already has been decided and held that the federal grazing district is not the appropriate unit. So, neither the evidence nor the law supports plaintiffs' position.

Plaintiffs also contend that with respect to the six round-up areas, defendants could not reasonably decide that environmental impact statements were not required. In other words, a negative declaration was not warranted. Here, again, the *National Resources Defense Council* case, supra, has usurped the field. Assuming an EIS is required in one or more of our problem areas, it is not due until the judgment of the District of Columbia Court says it is due, and that court has not attempted to prevent any BLM action in administration of the public lands pending filing of the required EIS's.

Further, one of the areas involved in this case, the Stone Cabin area, was before Judge Roger D. Foley in *American Horse Protection Ass'n Inc. v. Frizzell*, 403 F.Supp. 1206 (D.Nev.1975). There it was held directly that a round-up of 400 wild horses to ease pressure on the range was not action requiring an EIS because the round-up would not have a significant effect on the environment. The round-ups contemplated here are not different in kind.

In consideration of the premises stated, the BLM faces an emergency in the administration of the Wild Horses and Burros Act and other uses of the federal range, and in the light of the time table advisedly set by the District of Columbia Court for the preparation of EIS's. In 1971 the ranges in Nevada, Oregon and Wyoming carried approximately 10,000 wild horses. The object of the legislation was to "insure the preservation and protection of the few remaining wild free roaming horses and burros in order to enhance and enrich the dreams and enjoyment of future generations of Americans." (Joint Statement, supra).

The wild horses on Nevada ranges alone now exceed 35,000. Their demand on the range is patently excessive. In the initial

administration of the Taylor Grazing Act the allocations of range forage to sheep, cattle and domestic horses was made without consideration for wild free roaming horses. In fact, most of such animals are merely offspring of ranch horses which the owners did not go to the trouble to round up and restrain. Until 1971, said animals for the most part were trespassers on the federal range, and if the owners could have been identified, trespass actions would have been brought in the proper administration of the Federal Range Code.

■ The 1971 Act passed by the Congress made a place for the wild free roaming horses, but not in unlimited numbers, and not with a priority over other uses under the multiple use concept. *American Horse Protection Ass'n Inc. v. Frizzell*, supra. Inferentially, the population at around the 1971 level should be maintained.

The Environmental Analysis Records prepared for each of the six subject areas (in varying degrees of completion) are quite adequate to support the discretionary decision to remove some of the horses.

■ With respect to the first two areas, the Paradise-Denio area and the East Range area, all the horses are to be removed. This is appropriate because the owners of most of the private lands have demanded their removal. The law requires it. Title 16 U.S.C. § 1334 provides: "If wild free-roaming horses or burros stray from public lands onto privately owned land, the owners of such land may inform the nearest Federal marshall or agent of the Secretary, who shall arrange to have the animals removed." The only practical way this mandate can be honored in an unfenced checkerboard area is by removal of all the horses. True, the Secretary has promulgated regulations (43 C.R.F. § 4730.3) requiring fencing of private lands. (See also NRS 569.-440–50, for Nevada fencing requirements). This same subject matter was treated in *Roaring Springs Associates v. Andrus, et al.*, D.C.Or., 8/14/67.* I agree with

* There is also no reason to believe that Congress intended that the treatment of wild horses

would vary from state to state, depending on the state estray laws. First, this might head

the conclusions there reached that the regulations are invalid and that the statute imposes a mandatory duty to remove wild free roaming horses from private lands on demand.

■ The other four Environmental Analysis Records are replete with reliable information which sustain the proposed actions by the defendants. Plaintiffs' principal complaint is that the factor of available forage is based on range surveys made in the 1960's. This is the very factor which is a major subject of the District of Columbia judgment and timetable. In the light of the extensive increase in wild horse range demand since 1971, to await new range surveys (a time-consuming process) would unreasonably delay a required readjustment

the Act into unnecessary equal protection problems. Second, the Act was primarily intended to protect wild horses and burros and keep them on public lands as a symbol of our national heritage. Since the Act expresses national policy, there is no reason to believe that its enforcement was to vary from state to state.

The defendants next contention is that the Secretary of the Interior has promulgated a regulation, 43 C.F.R. § 4750.3, pursuant to § 1334 which undermines plaintiff's assertion that the Secretary has a duty to remove the wild horses from plaintiff's land. The regulation reads as follows:

The authorized officer shall remove, as soon as he can make the necessary arrangements, wild free-roaming horses and burros, from private land at the request of the landowner where the private land is enclosed in a "legal fence" . . . In "no fence districts" or other areas where the private landowner is not required by State statute to fence the private land to protect it from trespass by domestic livestock, the authorized officer shall, as soon as he can make the necessary arrangements, remove wild free-roaming horses or burros from such private land at the request of the landowner.

According to defendants this regulation imposes a duty on the Secretary to remove wild horses from private lands enclosed by a legal fence or from private lands which are unfenced if such lands are in a fence-in area (an area where livestock owners have a duty to fence their livestock in and a private landowner is not required to fence his land in to protect it from trespassing livestock). Defendants, however, insist that they have no duty to remove wild horses where the landowner has not fenced his property, but, under state law, must do so to protect it from trespassing livestock. In other words, defendants contend that in a fence-out or open range area (one where a

to reconform to the multiple use concept. In none of these four areas have defendants disregarded the probable range demand of wild horses existing in 1971.

Historically, the movement to foster protection and humane treatment of wild horses was led in Nevada by Mrs. Annie Johnston, affectionately known as "Wild Horse Annie." Mrs. Johnston, now deceased, formed an organization "Wild Horse Organized Assistance, Inc." and promoted the adoption by Congress of the Wild Horses and Burros Act. The present president of that organization testified that the roundup plans and procedures presently proposed by the BLM are fully consistent with the objectives, aims and purposes of the organization.

landowner must fence out trespassing livestock) they must only remove wild horses if the landowner has erected a fence. In the present case the land is in an open range area and the plaintiff has not erected a fence.

I agree with defendants' reading of the regulation. The question then is whether the regulation conflicts with the statute. If the regulation is inconsistent with the statute, the regulation must be rejected. It is the courts who finally decide questions of statutory construction and not the administrative agencies. *Patagonia v. Board of Gov. of Fed. Res. Sys.*, 517 F.2d 803, 812 (9th Cir. 1975).

I find the regulation to be inconsistent with the statute. The statute imposes a duty on the Secretary to remove wild horses and burros from private land upon notice from private landowners. It does not qualify private landowners or their land in any way. The duty extends to all private landowners who have wild horses and burros stray upon their land. The regulation puts qualifications on this duty, in effect saying that it only extends to certain landowners. I find this to be an inconsistency.

Moreover, if the regulation was valid it would allow the states to remove most, if not all, of the protection which § 1334 offers. The states might declare that all lands are in an open range. If so, the government would only be obligated to remove wild horses and burros that invaded fenced land. In an area such as eastern Oregon where few landowners fence their land, wild horses and burros could disappear from the public lands. This illustrates how the acceptance of defendants' argument would render the protection afforded to wild horses and burros under the Act a subject of state law and contravene the policy and purpose of the Act.

The final subject matter concerns the deplorable conditions that existed at the Palomino Valley Holding Corrals in the months of December, 1977 and January, 1978, as a consequence of which some horses were treated in a cruel and inhumane manner contrary to the express preclusions of the Act. The evidence nevertheless shows that the conditions were not wilfully and deliberately established and maintained by defendants. The 1977 round-up programs called for the gathering of approximately twenty-five hundred head of horses from federal ranges and their transportation to Palomino Valley for disposition pursuant to 16 U.S.C. § 1333(b):

"Where an area is found to be overpopulated, the Secretary, after consulting with the Advisory Board, may order old, sick, or lame animals to be destroyed in the most humane manner possible, and he may cause additional excess wild free-roaming horses and burros to be captured and removed for private maintenance under humane conditions and care."

The law also makes it explicitly clear that it is a crime for any person to sell a wild free roaming horse or burro or the remains thereof for commercial purposes. Accordingly, the Secretary has promoted an "adopt a horse" program. Section 4740.2(b) of the regulations provides:

"The authorized officer may also place animals in the custody of private persons, organizations or other governmental agencies. Custodial arrangements shall be made through cooperative agreement which shall include provisions to maintain and protect the animals and ensure that the animals will not be used for commercial exploitation. The authorized officer may, in his discretion, mark animals placed in private custody for identification purpose."

The statute (16 U.S.C. § 1333(c)) and regulations (43 C.F.R. § 4740.3) also expressly authorize the Secretary or his authorized delegate to destroy wild horses if that is the only practical means of disposition.

The law does not contemplate and the local officials of the BLM did not envision that the Palomino Valley Holding Corrals would be the home of the rounded-up wild horses for an indefinite period of time.

As a consequence of several interlocking factors, the conditions at the corrals became substandard: (1) too few corrals were constructed; (2) feeding racks were not constructed; (3) the corrals became overcrowded because (a) the "adopt a horse" program did not function to move horses out as rapidly as they came in, (b) the Secretary did not exercise his discretion to humanely destroy animals as the only "practical" alternative; (4) unusual and continuing heavy rains made an absolute quagmire of the corrals. These conditions resulted in unnecessary illnesses and injuries to horses and their ultimate destruction by shooting. Horses were loaded into a truck, six or seven at a time, and driven to the burial trench where they were shot while in the truck and then unloaded. Several witnesses undertook to express opinions regarding the psychological effect on a horse when another horse next to him is shot and killed. The qualifications to support such an opinion are questionable. Nevertheless, such wholesale slaughter of animals (especially horses) is considered by many to be degrading to the human spirit, and inappropriate conduct for a civilized human being.

It is very unlikely that these conditions will recur. More corrals have been built, feeding racks have been constructed, drainage has been provided and the testimony indicates that a market in the midwest has been found for successful administration of the "adopt a horse" program. Every one of the Environmental Analysis Records in evidence emphasizes and makes provision for the humane care and treatment of the animals during the round-ups and during transportation. We cannot assume the admonitions will be ignored. Neither can we assume that the Secretary will not exercise discretion to order the humane destruction of animals when there is no other practical alternative.

The evidence leaves a doubt with respect to whether every animal destroyed at the Palomino facility was killed after receipt of

a veterinarian's certificate. It is also undisputed in the evidence that the most humane way to kill a horse is by the injection of a barbiturate.

In consideration of the premises,

*IT HEREBY IS ORDERED*:

1. The motion to enjoin the round-ups of wild horses from Nevada ranges planned by defendants is hereby denied.

2. No wild free roaming horse or burro held at the Palomino Valley Holding Corrals shall be destroyed except on certificate of a licensed veterinarian that the animal is severely injured or seriously sick and should be destroyed as an act of mercy pursuant to section 4740.3–1 of the regulations, or except on order of an authorized officer pursuant to section 4740.3 of the regulations, and destruction shall be by injection, rather than shooting.