DeMar DAHL and Thelma Elsner, Plaintiffs,

v.

William P. CLARK,* Secretary of Interior; Robert Burford, Director, BLM; Edward F. Spang, State Director, BLM; James Fox, Battle Mountain District Manager, BLM; Frank Shields, Winnemucca District Manager, BLM, and Thomas J. Owen, Carson City District Manager, BLM, Defendants.

No. CV–R–82–124–ECR.

United States District Court, D. Nevada.

Dec. 31, 1984.

Wilson, Wilson & Barrows by Stewart R. Wilson, Elko, Nev., for plaintiffs.

Lamond R. Mills, U.S. Atty. by Shirley Smith, Asst. U.S. Atty., Reno, Nev., Jose Toro, Dept. of Justice, Washington, D.C., for defendants.

Russell J. Gaspar, Washington, D.C., for American Horse Protection Assn., Inc.

MEMORANDUM DECISION
AND ORDER

EDWARD C. REED, Jr., District Judge.

DeMar Dahl filed this action on March 29, 1982. Following the transfer of some of the affected grazing rights to Thelma

---

* Pursuant to Fed.R.Civ.P. 25(d)(1) William Clark has been substituted for James Watt.

Elsner, she was joined as a plaintiff. The action seeks a writ of mandamus ordering the defendants to immediately reduce the wild horse herds on the Hole-in-the-Wall, Fish Creek, and Jersey Valley Allotments to their 1971 levels. These allotments are comprised of public lands in Pershing, Lander, and Churchill Counties, Nevada, under supervision of the Bureau of Land Management (BLM). The defendants are officials of the Department of the Interior and the BLM.

The jurisdiction of this Court is invoked under 28 U.S.C. § 1361 which provides that:

"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

█ The mandamus jurisdiction of this court is limited to requiring federal officials to perform plainly described ministerial duties. *Tagupa v. East-West Center, Inc.*, 642 F.2d 1127, 1129 (9th Cir.1981).

A bench trial was held from July 16 to 20, 1984, and completed on August 2, 1984. The parties have filed post trial briefs and oral arguments have been presented.

Plaintiffs contend that the 1971 wild horse population in all three allotments was no more than 62 animals. By 1978 this number had risen to 307 and by 1981 to 485. On July 12, 1984, John McLain, an expert witness for plaintiffs, and plaintiff DeMar Dahl flew over the allotments and Mr. McLain counted 655 head of wild horses, mostly in the Jersey Valley allotment. During the period 1971 to 1982 the BLM conducted numerous surveys and studies of range conditions in the three allotments, almost all of which reached the conclusion that the trend of the condition of the range was downward, mandating a reduction in both livestock and wild horse use. On several occasions BLM officials recommended

and in some instances may have decided that a number of wild horses should be removed from the allotments, but no action was ever taken by the BLM for such removal. Plaintiffs contend that the present condition of the range is poor and deteriorating and that the Court should require the BLM to reduce the number of wild horses to 1971 levels. Plaintiffs claim that utilization of available forage on the allotments by wild horses is excessive and is contributing to the worsening condition of the range. They point to BLM records indicating severe and heavy use of key plant species used by grazing animals.

Defendants respond that they do not have an obligation under the law or regulations to reduce the wild horse population to 1971 levels. Defendants argue that the laws require them to remove wild horses only if actual ongoing substantial damage to the range is occurring because of an excess number of wild horses using it. Further, defendants argue that pursuant to his authority in 1981, Secretary of the Interior James Watt rejected prior BLM study methods and the conclusions reached from them as inaccurate, and directed the BLM officials in the field to maintain numbers of livestock and wild horses on the public lands at 1981 levels and to commence use of new monitoring studies as to range utilization. Secretary Watt believed the new study methods utilized more modern scientific methods.[1] There was some evidence received at the trial to support Secretary Watt's conclusion that the previous BLM studies were invalid. James Phillips, a BLM official, testified that studies by an independent consultant, as well as the experience of other states, showed that the former BLM methods of range study were inaccurate and could not be relied upon for range management decisions. In particular, defendants claimed that the so-called "one point in time" observation studies which had been used by the BLM were

---

1. Although the reason for Secretary Watt's directive is not clear, it appears to the Court that it most likely resulted from the fact that the previous studies indicated that use of the public

domain by livestock and by wild horses would have to be drastically reduced due to damage to the range caused by overutilization.

deficient. Plaintiffs' evidence at trial, on the other hand, supported the validity of the prior BLM range analyses.

Defendants now also contend that there is no evidentiary or factual basis to remove any of the wild horses on any of the three allotments because the range is in adequate condition to support the present numbers of livestock and wild horses using it and that there is no substantial ongoing resource damage. Defendants contend that available utilization figures show that the plant species used by the grazing animals are not being overutilized and that use of these species is not excessive or damaging to them.

Defendants also challenge the horse censuses from 1971 forward to 1977 as inadequate and inaccurate, and incorrectly reflecting the true horse population during that period. Defendants claim that the horse numbers were actually substantially larger than the BLM censuses indicated.

The Court finds that this case is governed by the following authority.

In 1971 Congress recognized that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. § 1331. Congress, therefore, announced the policy that "wild free-roaming horses and burros shall be protected ... and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands." *Id.*

The 1971 Act declares that all wild free-roaming horses are placed under the jurisdiction of the Secretaries of Interior and Agriculture for the purposes of management and protection. 16 U.S.C. § 1333(a).

The Secretary is directed to protect and manage the wild horses as components of public lands. The Secretary is authorized to designate and maintain "specific ranges on the public lands as sanctuaries [for] their protection and preservation." *Id.* Such wild horse ranges are to be established only after consultation by the Secretary with the wild life agency of the state and the appropriate advisory board. *Id.* The Secretary is further directed to manage the wild free-roaming horses in a manner that is designed to achieve and maintain a "thriving natural ecological balance" on the public lands. *Id.* Management activities are required to be at the "minimal feasible level." *Id.* The Act also requires the Secretary's actions to be taken in consideration of the recommendations of qualified scientists.

The planning process on the public lands is guided by the Federal Land Management and Policy Act (FLPMA) of 1976, 43 U.S.C. § 1701 *et seq.* Pursuant to its mandate, the BLM conducts studies and, following several prescribed steps, prepares a final plan describing the manner and the extent to which grazing is to be permitted on the allotment in order to meet the multiple-use objectives set forth.

In 1978 Congress, recognizing that circumstances had changed, passed the Public Range Lands Improvement Act (amending the 1971 Act).[2] The 1978 amendments provide for a determination as to whether there are excess wild horses on the public domain and if so to determine whether they should be removed. By this Act the Secretary is required to maintain a current inventory of wild horses on given areas of the public lands so that determinations can be made as to whether overpopulation exists and whether action should be taken to remove excess animals. The Secretary is to "determine appropriate management levels of wild horses" and whether appropri-

2. The legislative history indicates Congress' concern:

"In the case of wild horses and burros in the Western States, Congress acted in 1971 to curb abuses which posed a threat to their survival. The situation now appears to have reversed, and action is needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." H.R.Rep. No. 95–1122, 95th Cong., 2d Sess. 23 (1978).

ate management levels should be achieved by removal of excess animals or other means. 16 U.S.C. § 1333(b)(1). The thrust of the 1978 amendments is to reemphasize the management of the public lands pursuant to a multiple-use concept. The effect of this reemphasis is to cut back on the protection of the horses and burros under the 1971 Act.

In addition, the 1978 amendments introduce a definition of "excess" horses: horses are in "excess" if they have been removed or "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

The BLM has promulgated regulations with respect to its obligation under the 1971 Act as amended in 1978. In addition to regulations dealing with the definition of "excess," the regulations address the problem of possible excess numbers of wild horses on the public domain. 43 C.F.R. § 4700.0-5(d) (1983). It requires the appropriate officer of the BLM for each area where a herd of wild horses exists to maintain a current inventory of such horses in order to evaluate population trends in rela-

tion to the environment. In planning for management of the wild horses, including determination of desirable numbers, the BLM officers are required to utilize the Bureau's multiple-use planning system. Using information developed from inventory data and planning BLM officers are required to determine appropriate actions needed to achieve proper population levels upon consultation with the U.S. Fish and Wild Life Service, State Wild Life agencies, individuals recommended by the National Academy of Sciences and other individuals with scientific expertise or special knowledge of wild horses, wildlife management and animal husbandry as related to range land management. 43 C.F.R. § 4730.1(d). The BLM may manage wild horse herds "either as one of the components of public land use or on a specifically designated wild horse ... range." 43 C.F.R. § 4730.2. Further, "management practices shall be at the minimal feasible level." Id.

Additional regulations provide for studies to determine the biological requirements of wild horses,[3] possible designation of specific ranges,[4] development of a herd management plan,[5] and removal of excess animals.[6]

**3.** 43 C.F.R. 4730.3 provides:
"*Habitat reservation and allocation.* The biological requirements of wild ... horses ... will be determined based upon appropriate studies or other available information. The needs for soil and watershed protection, domestic livestock, maintenance of environmental quality, wildlife, and other factors will be considered along with wild ... horse ... requirements. After determining the optimum number of such ... horses ... to be maintained on an area, the authorized officer shall reserve adequate forage and satisfy other biological requirements of such horses ... and, when necessary, adjust or exclude domestic livestock use accordingly."

**4.** 43 C.F.R. § 4730.5 provides:
"*Designation of specific ranges.* The authorized officer may designate and maintain specifically designated ranges principally for the protection and preservation of wild ... horses .... In designating specific ranges and herd management areas, the authorized officer in addition to any other provisions of these regulations shall:
(a) Consider only those areas utilized by wild ... horses ... as all or a part of their habitat on December 15, 1971.

(b) Consider only those areas where self-sustaining herds can maintain themselves within their established utilization and migratory patterns.
(c) Consider only those areas which are capable of being managed as a unit to insure a sustained yield of forage without jeopardy to the resources.
(d) Develop a wild horse management plan in accordance with § 4730.6.

**5.** 43 C.F.R. § 4730.6 provides:
"*Herd management plan.* The authorized officer shall in connection with designation of a specific range, develop a proposed wild ... horse ... management plan designed to protect, manage, and control wild ... horses ... on the area on a continuing basis. The authorized officer may also develop herd management plans as a part of the multiple-use management on areas outside of specifically designated wild horse ... ranges. All management plans shall be developed in accordance with the Bureau's planning system and shall govern management of the area."

**6.** 43 C.F.R. § 4740.3(a) provides:
"*Removal.*
(a) The authorized officer, after making a determination that there are excess animals in

Historically grazing permits were not required on the public lands. However, following the enactment of Taylor Grazing Act, 43 U.S.C. § 315 *et seq.*, permits for grazing privileges were granted to private livestock operators to graze livestock on the public domain on the basis of historical use. These rights were attached as appurtenances to privately owned ranch lands capable of supporting the livestock when they were not grazing on the public domain.

In the 1960s, in response to criticisms of overstocking, the BLM initiated range surveys to determine the carrying capacities of the various ranges. Grazing privileges were adjusted to accord with forage available. Since the 1960s these livestock grazing privileges have generally remained in effect, permitting grazing at the levels fixed in the studies made at that time. The operators pay a fixed sum for each animal unit month (AUM) of their use of the range by their livestock. In 1984 that figure is $1.37 per AUM. An AUM generally consists of one head of livestock grazing on the public domain for a period of one month.

In 1976 the National Resource Defense Council (NRDC) initiated an action in the U.S. District Court for the District of Columbia and obtained judgment against the BLM to require environmental impact statements (EISs) for livestock grazing on the public lands. *See National Resources Defense Council, Inc., v. Morton*, 388 F.Supp. 829 (D.D.C.1974), *aff'd*, 527 F.2d 1386 (D.C.Cir.1976) *cert. denied* 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976); *Natural Resources Defense Council, Inc., v. Andrus*, 448 F.Supp. 802 (D.D.C.1978). The Court forced the BLM to prepare such statements on short notice for each range area. Defendants contend that the BLM data available for preparation of the EISs

was outdated, but the court nevertheless insisted that the reports be prepared on that basis. In this case defendants' evidence indicates that using this outdated information the BLM adopted a range survey approach, an inventory procedure, in order to estimate the carrying capacities of the ranges for the purposes of preparation of the EISs. The results of EISs based on the range survey approach were alarming in many cases mandating drastic reductions in both livestock and wild horse use of the affected ranges. For example, in the Jersey Valley Allotments the applicable EIS would have required reduction of cattle use by 50–55% and reduction of wild horses to nothing in some areas.

It was at that time in 1981 that the directive came forth from Secretary Watt renouncing all the previous studies and requiring BLM to start afresh, using as a starting place the existing numbers of wild horses and livestock in each range area and to commence use of new scientific approaches to determine range carrying capacities. Defendants' Exhibit O, Letter from James Watt. The levels of then existing wild horse and livestock populations were to be continued and the animals were to continue to use their respective then existing ranges. Population levels were made subject to adjustment on the basis of intensive monitoring studies that were to continue. The effect of Secretary Watt's 1981 instructions was to reverse what appear to be the BLM's longtime orientation from one of looking for downward trends in range conditions to one of looking for upward trends or at least static range conditions. Until Secretary Watt's directive, the studies of the BLM and their management consistently found range conditions poor and on a downward trend calling for reduction in livestock numbers and removal of wild horses. Since the time Secretary

an area shall immediately take action to remove those animals from the public lands. Such action shall be taken in the following order and priority, until all excess animals

have been removed so as to restore a thriving natural ecological balance to the range and protect the range from deterioration associated with overpopulation ..."

Watt's letter was issued, the BLM has been making the opposite findings and recommendations. One has to admire the steadfast loyalty of the BLM officials in following the dictates of their superiors in the Department of Interior, no matter which way the wind blows at a particular time.

In this case, the BLM contends that all the data available to it in 1981 was outdated and unscientific. The evidence presented at trial, however, does not bear this out. It appears that the BLM had been conscientiously and efficiently studying the ranges on a continuing basis prior to and during the 1970s and early 1980s. Many of these studies (including those made on the subject allotments) were made on bases in conformity with the scientific approaches called for by Secretary Watt in his 1981 letter, rather than on the basis of the criticized "one point in time" observations. Such range investigations were frequent and continuous and cannot by any means be entirely discounted or discarded as inaccurate.

The condition of the ranges as observed by plaintiffs' witnesses bears out to some extent the accuracy of the now rejected BLM studies through the 1970s and early 1980s. It is interesting to note, however, that when the EIS prepared in response to the NRDC case dictated reduction in livestock use in Jersey Valley, Mr. McLain, plaintiffs' expert witness here, was at that time able to persuade the BLM not to invoke the planned reductions because of what he argued were acceptable conditions of the range.

In judging the actions of the BLM in the case at bar, the question before the Court is whether the present BLM administration of the public domain is rational. We are required to take account of the considerable authority to manage the ranges which Congress has delegated to the BLM.

The preponderance of the credible evidence presented at the trial in this case is directly contradictory to the current position of the BLM, on the condition of the range on the three allotments as it now exists. The BLM's position that the range is in adequate condition is not supported by the evidence. The only government witnesses who offered significant testimony based on personal observations of the subject ranges were Timothy Rewsaat, wild horse and burro specialist for the BLM, and John Kirch, BLM range conservationist. Mr. Rewsaat has been on the range recently and testified that in his opinion damage to the range in the Fish Creek Allotment was due to cattle utilization rather than wild horses. Mr. Rewsaat, however, did not offer extensive testimony based on his personal observations of the range to refute the testimony of plaintiffs' witnesses. Mr. Kirch's work on the allotments is more recent. He has commenced what are called frequency studies which are long-range studies expected to last up to 20 years before a trend of range conditions can be predicted. The defendants' case is not, however, based to any substantial degree on Mr. Kirch's opinion as to the present condition of the range.

Aside from these two witnesses the BLM's contentions that the range is in fact in adequate condition to support present levels of wild horses and livestock is based upon Exhibit G which reflects available forage utilization in each of the allotments for the period 1978–84 as to Fish Creek, 1977–83 as to Hole-in-the-Wall and 1980–84 as to Jersey Valley. While Secretary Watt specifically rejected one point in time observation studies as being inaccurate, the thrust of his 1981 directive is to reject all pre-1981 studies apparently because of his conclusion that then current numbers of animals should be maintained. The Watt directive places BLM in the position in this case of having to attack its previous studies, conclusions, decisions, and to some extent it own expert personnel. Previous BLM studies had indicated a downward trend in range condition and the necessity of reduction of numbers. Previous BLM studies included not only one point in time studies but studies which required repeated observations such as photo trend plots. Many of the pre-1981 studies appear to meet the criteria which are now supposed to be met

to achieve accurate and reliable results. Despite Secretary Watt's rejection of them, the BLM nonetheless relies upon these pre-1981 studies in its Exhibit G in attempting to show that the trend of the allotments is not downward and that the forage utilization is not excessive.

The evidence in the case does not disclose what sorts of studies the BLM may be relying upon for its analysis of average forage utilization or trends after 1981 (when the previous study methods were rejected) except for Mr. Kirch's testimony as to frequency studies to determine trend conducted at intervals of three years and which take up to 20 years to complete. It is clear that the types of studies Mr. Kirch is doing do endeavor to ascertain forage utilization by scientific observation of trained range conservationists such as Mr. Kirch.

It may be assumed, therefore, that the average forage utilization reflected on Exhibit G for the allotments is a result of personal observation by BLM employees. Exhibit G reflects a low utilization of the total forage available, in a majority of the cases something approaching half of the forage utilization reflected in BLM records in 1981 and prior thereto. However, the conclusions which might be derived from Exhibit G are not supportable, taking the credible record as a whole. The evidence is that the allotments are not being maintained and preserved so as to maintain a thriving natural ecological balance to the range. The range is not being protected from deterioration associated with overpopulation of wild horses.

Plaintiffs' position is that the range is in an inadequate condition. The evidence presented by plaintiffs included the testimony of DeMar Dahl and Earl Elsner as to their observation of overpopulation of horses adversely affecting range conditions. Plaintiffs rely, however, primarily on the expert testimony of John McLain, a Professional Range Management Consultant, and Edwin Smith, a range specialist, for the contention that the wild horse populations in the allotments should be ordered reduced.

Mr. Smith endeavored to draw together for presentation to the Court information gleaned from the records of the BLM. These records essentially relate to the period from 1971 to 1983 and are comprised by studies and conclusions from them which the BLM now contends are invalid because the studies did not accurately reflect the range conditions. If these BLM records were accepted as being accurate, plaintiffs' case would be made, but the defense is that the BLM's own records are no good and cannot be trusted for the periods mentioned. Interestingly enough, however, contrary to the position defendants now take in their key Exhibit G, and through their witnesses Mr. Rewsaat and Mr. Kirch, in defendants' answer to an interrogatory posed by plaintiffs (Exhibit 3, Interrogatory No. 3), defendants admit that the subject range condition is poor, the trend is downward, and overgrazing and overutilization are indicated.

Mr. Smith also had made various personal observations of the range and his testimony was that the allotments are not at ecological potential and that they reflect heavy and severe use by wild horses which is in the process of damaging the resource.

Mr. McLain had visited the area of the three allotments on three different occasions, 1979, 1983 and 1984. Based on these visits, Mr. McLain opined that grazing use has exceeded tolerable levels and that the major contributor to the excess use is wild horses. Mr. McLain further opined that the downward trend of the condition of the range is due to wild horses. Mr. McLain bases his opinion not only on his personal observations but also on a review of the BLM records compiled by Mr. Smith. To illustrate the reasons for his opinion Mr. McLain presented a number of slides taken in various areas of the allotments which reflect heavy horse use and heavy damage to the range.

In an effort to refute Mr. McLain's testimony, the defendants presented the testimony of Professor Frederick Wagner of

Utah State. Professor Wagner testified that Mr. McLain's testimony reflected an inadequate study to reach the conclusions that he did. Specifically, Professor Wagner testified that the slides presented by Mr. McLain did not cover sufficiently wide or representative areas in order to reach a conclusion that the range was in poor condition. However, Mr. McLain testified that the slides were reasonably representative of conditions throughout the allotments. To a great extent the slides concentrated on water areas. While there was no extensive testimony offered as to the exact amount of water available in various portions of the allotments, the Court must conclude, on the basis of the evidence, that there are relatively few sources of water. Aside from one stream in Fish Creek Allotment, water sources consist of widely separated springs (mostly of quite modest dimensions) and also widely separated wells. It appears that both cattle and wild horses use the limited amounts of water from these sources.

In the rebuttal case plaintiffs, to a considerable extent, refuted the conclusions that might be reached on the basis of defendant's Exhibit G. Exhibit G was an effort by defendants to support Secretary Watt's policy of maintaining 1981 animal numbers. Plaintiffs point out that Exhibit G relies on observations of available forage utilization made at varying times of the years rather than at the same time each year. Therefore, plaintiffs contend that the observations are really of "apples and oranges" and cannot be compared. Plaintiffs also attack, through Exhibit 28, the BLM concept of "average forage utilization" used in Exhibit G. Maps of forage utilization prepared by the BLM in the period 1980–82 show areas of heavy use ranging down to areas of slight use with resulting averages that appear to be reasonable but which do not reflect the actual condition of large areas of the ranges where there has been heavy and probably damaging use by grazing animals.

Plaintiffs' evidence also shows that precipitation was heavy (far above normal) in 1983 so that year should not be used to determine conditions for management of the range over the long term.

Finally, as emphasized above, it is hard to believe that all of the myraid of observations by BLM officials for the long period of time prior to 1981 should be discounted. The evidence in this case and the presentations of the BLM officials indicate that they are dedicated, trained and efficient in every respect. Hence it is hard to ignore many observations by BLM officials repeatedly made, such as "horse use severe", "trampling evident", "shrubs broken; grasses pulled up by roots; horse manure everywhere", or observations such as "heavy horse use", "looks like mostly horse use", when made by BLM officials who were determining forage utilization at the time those observations were recorded.

The slides, the testimony of plaintiffs' witnesses, and the evidence admitted at trial lead the Court to conclude that the ranges in question are substantially overused and that the environment on the allotments has been severely damaged, because of wild horse and livestock use. This Court, therefore concludes that the areas in question are not in a thriving, ecological condition.

It doesn't appear, therefore, that so far as these three allotments are concerned, the Secretary of the Interior is carrying out his mandate under the Wild Horse Act, as amended. The decision to maintain 1981 numbers has not been made after determining the optimum number of horses to be maintained on the area. It is simply an arbitrary decision to maintain 1981 numbers. While the BLM has attempted to support Secretary Watt's decision as best it could, the preponderance of the evidence is that the decision to maintain 1981 wild horse population levels is not based upon any evidence, analysis or studies but simply on the decision Secretary Watt made in order to avoid reductions in livestock and wild horse populations in 1981. Except conceivably through the testimony of Professor Wagner, there is no indication from the evidence that the BLM made its man-

agement decision to maintain 1981 wild horse population levels after consultation with any of the individuals or agencies mentioned in 43 C.F.R. § 4730.1(d).

Perhaps Secretary Watt's 1981 decision may be defended as being a practical management decision based upon the necessity for "doing something." However, a closer look at the decision reveals that it cannot be defended. As mentioned, a decision made on such a basis is not in compliance with the regulations of the Bureau of Land Management contained in 43 C.F.R. § 4700. Nor does the decision accord with the specific directives contained in the 1978 amendments to the Wild Horse Act incorporated in 16 U.S.C. § 1333(b) which call for the Secretary, in the absence of the specific items of information contained in paragraphs (i) to (iv) § 1333(b)(2) (if previous data contained in land use planning and EISs was found to be inadequate, as it supposedly was), to act on the basis of all information available to him rather than simply making an arbitrary decision.

Ultimately we reach the question of whether mandamus is appropriate. Thus, in spite of the apparent failure of the Secretary to carry out the mandate of the Wild Horse Act by appropriately managing the wild horses and the ranges, we must determine whether the defendant officials of the Department of the Interior and the BLM owe a plainly described ministerial duty to plaintiffs. The question is whether the actions of the Secretary and of the BLM represent a rational administration of the Wild Horse Act and the related statutes applicable here. If they represent a rational administration, then mandamus would not lie, notwithstanding that the administration is less than perfect.

Plaintiffs also urge the Court that they are entitled to relief under the Administrative Procedures Act (APA) 5 U.S.C. § 706. This section gives the Court jurisdiction to compel agency action unlawfully withheld or unreasonably delayed. In this case the thrust of such a claim is that BLM has failed to reduce wild horses in the subject allotments to 1971 population levels and has failed to timely establish the Augusta Mountains Horse Management Area (AMHMA). Since this Court concludes elsewhere in this opinion that plaintiffs are not entitled to reduction of wild horses to 1971 levels, plaintiffs are not entitled to APA relief on that issue. The BLM alleges it is in the process of taking action to establish the AMHMA. That action, it claims, will be completed by November of this year and it would, under these circumstances, be inappropriate to require such action to be taken under APA.

However, a part of the Court's problem in making its decision is resolved by the relief the plaintiffs are seeking by way of a writ of mandamus to the Department of the Interior and the BLM to reduce wild horse population to 1971 levels. It was made absolutely clear by plaintiffs' counsel at final oral argument that plaintiffs seek to have the wild horse populations in these allotments reduced to 1971 levels, and to no other levels. Plaintiffs' position is that any other population levels are unsupportable and that the setting of wild horse population levels, other than at those existing in 1971, is a political issue beyond the jurisdiction of this Court. While these contentions may be subject to question, we are constrained to consider the relief plaintiffs seek in this case, rather than what they do not seek. Hence, we must face squarely the issue of whether under the law and regulations the Secretary is required to maintain wild horse population levels at those of 1971. Our answer is in the negative.

The statute (16 U.S.C. § 1333(a)) directs the Secretary to manage the wild horses in a manner designed to achieve and maintain a "thriving, natural ecological balance on the public lands." § 1333(b) speaks in terms of "appropriate management levels," and removal or destruction of excess animals "so as to restore a thriving, natural, ecological balance to the range, and protect the range from the deterioration associated with overpopulation ...". The regulation in 43 CFR § 4700 speaks of preserving and maintaining "a thriving, natural, ecological

balance and multiple-use relationship in [the] area." The BLM is to determine "proper population levels." 43 C.F.R. § 4730.1(c)(2). In planning for management, the BLM determines "desirable numbers." 43 C.F.R. § 4730.1(b). Neither the statutes nor the regulations speak in terms of the numbers extant at any particular point in time. The benchmark test is thriving ecological balance. The wording of the statute does not lead one to a conclusion that Congress intended that this necessarily meant 1971 levels. Nor does the interpretation by the BLM in administering the statute indicate that it believed that this was the intent of Congress or the correct basis for administration of the public lands.

The legislative history supports a finding that Congress had no intention to maintain the free-roaming horses and burros at their 1971 levels. In 1971, Congress was faced with incomplete information as to the numbers of horses on the public lands. In discussing the need for the 1971 Act, the Senate Report states:

> "Estimates of the total number of animals subject to the measure are open to question.... This indicates an alarming trend as well as a surprising lack of information regarding the animals and prompted the committee to include a provision in the bill for necessary studies of the habits of the animals to be undertaken by the Secretary of the Interior. S.Rep. No. 92–242, 92nd Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Ad. News 2149, 2150.

The report goes on to note that "[g]uidelines for reducing the population of wild-free roaming horses or burros in an area are provided in the measure but it should be noted that any reduction should be carefully weighed before being undertaken." *Id.* at 2152. In addition, the joint statement of the committee of conference specifically "pointed out that the Secretaries of Interior and Agriculture are given a high degree of discretionary authority for the purposes of protection, management, and control of wild free-roaming horses and burros on the public lands. The Act provides the administrative tools for protection of the animals from the depredation of man. This is the paramount responsibility with which the Secretaries are charged under the terms of the statute." Conf.Rep. No. 92–681, 92nd Cong., 1st Sess. *reprinted in* 1971 U.S.Code Cong. & Ad.News 2159, 2160.

Plaintiffs rely on two cases which at first glance apparently provides some support for a return to the maintenance of horses at 1971 levels. However, a closer reading of these cases reveals that the courts involved were not faced with the issue at bar and any statements are merely dictum. In *American Horse Protection Ass'n (AHPA) v. Andrus,* 460 F.Supp. 880, 885 (D.Nev. 1978) *aff'd in part, vacated in part and remanded,* 608 F.2d 811 (1979), the Hon. Bruce Thompson stated that inferentially, the population of wild horse herds should be maintained at around the 1971 level. AHPA focused on whether the removal of thousands of wild, free-roaming horses from public lands constitutes a major federal action significantly affecting the environment so as to require a preparation of an environmental impact statement. The issue of what levels should be maintained was not squarely before the court and no examination of the statute or legislative history was done. Thus, this court is in no way bound by it.

In *Mountain States Legal Foundation (MSLF) v. Watt,*[7] the lower court had concluded that all wild, free-roaming horses on public lands above the population agreed upon by the BLM and neighboring landowners were excess animals. Despite this holding, the court went on to say that excess could also be defined as those wild, free-roaming horses exceeding the areas' population levels "at the time the Act was passed." Again, the statement was made with no reference to the Act or to the

---

**7.** Unpublished opinion of the District of Wyoming. A copy of this decision has been provided to the Court and counsel.

appropriate legislative history. The subsequent decision by the Tenth Circuit lends absolutely no support to plaintiffs' contention for a reduction of horses to 1971 levels. *See MSLF v. Clark*, 740 F.2d 792 (10th Cir.1984).

If plaintiffs were looking for a mandamus requiring reduction of wild horse levels to levels other than to 1971, this case might come out differently as to this issue. However, the Court does not have to reach any question other than whether mandamus will lie to require BLM to reduce the wild horse population to 1971 levels. As mentioned above, the only conclusion which this Court can reach is that mandamus will not lie because the test as to appropriate wild horse population levels is whether such levels will achieve and maintain a thriving, ecological balance on the public lands. Nowhere in the law or regulations is the BLM required to maintain any specific numbers of animals or to maintain populations in the numbers of animals existing at any particular time.

■ An issue was developed during the course of the trial relative to the establishment of the Augusta Mountains Horse Management Area (AMHMA). At the final oral argument plaintiffs' counsel contended that the purpose in raising this issue was to seek mandamus to require the BLM to establish the management area. He contended that the management area has not been properly established and that BLM should be required to go ahead and establish the area pursuant to the applicable law and regulations. Defendants contend that they have taken steps to establish the AMHMA in both the Fish Creek and Jersey Valley allotments, and that the decision for the establishment of the management area in the Hole-in-the-Wall Allotment will be completed in November, 1984. 16 U.S.C. § 1333(a) provides that the authorized officer *"may* designate and maintain specific ranges on public lands as sanctuaries" for the protection and preservation of wild horses (emphasis added). 43 CFR § 4730.5 provides that the BLM *"may* designate and maintain" such areas (emphasis supplied). Neither the law nor the regulations require the establishment of such management areas. The decision as to whether such areas should be established appears to be purely discretionary with the Secretary and his subordinates. There is no plainly described ministerial duty imposed upon the Secretary to establish such management areas.

If, as plaintiffs contend, no such actions have been, or are in the process of, being undertaken, then mandamus will not lie because the Secretary has no obligation to establish such management areas. On the other hand, if as defendants contend such action has been taken, then there is a possible problem with respect to exhaustion of administrative remedies. Possible administrative remedies may not have been exercised and/or exhausted at least to the extent of the establishment of the managements areas in the Fish Creek and Jersey Valley Allotments.[8] It is clear that administrative remedies could not have been either exercised or exhausted with respect to the establishment of the management ar-

**8.** There were serious questions raised at trial as to the validity of the proceedings to establish the AMHMA. The first mention of the possibility of establishing such an area is contained in a bare notation made on an overlay in BLM records by a district manager of the BLM between 1973 and 1975. While BLM officials contended at trial that the AMHMA as now contemplated is based upon a 1971 wild horse use area, there is scant support in this record for such a proposition. The preponderance of the credible evidence at the trial indicates that there was a herd use area in the vicinity of these Allotments in 1971, but that the 1971 herd use area was much more restricted in size than that now proposed.

The record does not indicate that the provisions of 43 C.F.R. §§ 4730.5 and 4730.6 have been complied with in several respects in establishing the management area. First, as mentioned above, the evidence in this record does not indicate that in establishing the management area the BLM has considered only areas utilized by wild horses as a part of their habitat on December 15, 1971, or an area capable of being managed to insure sustained yield of forage without jeopardy to the resources. Nor does the record indicate that in compliance with 16 U.S.C. § 1333(a) there has been consultation with the Wild Life Agency of Nevada and with an Advisory Board established under 16 U.S.C. § 1337.

eas in the Hole-in-the-Wall Allotment because according to the BLM that decision was not final at the time this matter was submitted to the Court for decision.

In any event, the pretrial order does not indicate that the establishment of AMHMA is one to be decided as a separate issue by the Court in this case. In fact, the pretrial order states under facts which were admitted by both sides and which would require no proof:

"5. Portions of the Fish Creek, Hole-in-the-Wall and Jersey Valley allotments lie within the BLM-established Augusta Mountain Herd Management Use Area (Augusta Mountain HMUA) established by the BLM pursuant to the Wild Horse and Burro Act of 1971. The BLM's Battle Mountain District Office is responsible for managing this area."

Pretrial order for *Dahl v. Watt* at 2. Further, there is a serious question as to whether this issue has been fully litigated in this case. As the evidence came in it appeared that the establishment of the management areas was a peripheral question, bearing perhaps on the activities and intent of the BLM officials in managing the wild horses in these Allotments or possibly relating to the status of their actions in the management of the wild horses there.

For these reasons no order will be entered with respect to the proceedings to establish AMHMA.

The foregoing shall constitute findings of fact and conclusions of law.

IT IS, THEREFORE, ORDERED that the Clerk shall enter judgment against plaintiffs and in favor of defendants.