NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,

v.

Donald P. HODEL, as Secretary of the United States Department of the Interior, et al., Defendants.

Civ. No. R–84–13–ECR.

United States District Court, D. Nevada.

Dec. 30, 1985.

David B. Edelson, Johanna H. Wald, Natural Resources Defense Council, Inc., Laurens H. Silver, San Francisco, Cal., for plaintiffs.

F. Henry Habicht II, Asst. Atty. Gen., Wells Burgess, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., William A. Maddox, U.S. Atty., Shirley Smith, Asst. U.S. Atty., Reno, Nev., for defendants.

## MEMORANDUM

JAMES M. BURNS, District Judge, Sitting by Designation.

This is a complex case of first impression, brought by environmental organizations seeking to overturn certain decisions made by the Bureau of Land Management (BLM) relating to livestock grazing on public lands in the Reno, Nevada area. The plaintiffs challenge the BLM's land use plan as being in conflict with Congressional statutory mandates, and as being arbitrary and capricious as a matter of administrative law. They also raise a variety of challenges to BLM's environmental impact statement which purports to evaluate its proposed plan in comparison to other alternatives.

I have considered each of the many arguments raised by plaintiffs in this case in painstaking detail. The sheer size of the record, the complexity of the arguments, and the lack of useful precedent in many areas of the case have made this a perplexing chore for me. As a result, I have spent an extraordinary amount of time in reviewing, researching, and trying to decide these issues in a legally correct and fair way. Many of the complaints raised by plaintiffs have factual merit and suggest the possibility of either bad management or insensitivity to certain environmental concerns on the part of the BLM. But in the final analysis, I have concluded that these complaints do not give rise to causes of action sufficient to allow this court to intervene in the BLM's grazing programs in the manner sought by plaintiffs. To do otherwise

would ultimately require this court to adopt the opinion of one expert over that of another, or to adopt one theory of range management over another. While I may not personally approve of some of the actions taken by the BLM, (in the sense that if I were the "rangemaster" I might as well have produced a different plan) I am powerless to substitute my judgment for that of the BLM in these matters. Such would be the inescapable result of the position urged by plaintiffs. For this reason I grant defendants' motion for summary judgment and deny the plaintiffs' cross motion.

BACKGROUND

The BLM manages some 171 million acres of federal lands in 11 western states. Responsibility for managing these lands was vested in the BLM initially by the Taylor Grazing Act of 1934, now codified at 43 U.S.C. § 315 et seq. The supervision of livestock grazing on these lands is a principal activity of the BLM.[1] The BLM lands are divided for grazing purposes into districts, and subdivided into planning areas, such as the "Reno Planning Area" which is the subject of this action. The Reno Planning Area encompasses an overall area of just over 5 million acres, about 700,000 of which are under BLM supervision. (A.R. V: 494).[2] The planning areas are further divided into grazing allotments, for which the BLM issues grazing permits or licenses.

In 1974 the BLM prepared a single, programmatic Environmental Impact Statement (EIS) to cover its entire grazing program. That EIS was declared to be inadequate by the U.S. District Court for the District of Columbia in *Natural Resources Defense Council v. Morton,* 388 F.Supp.

829 (D.D.C.1974), *affirmed* 527 F.2d 1386 (D.C.Cir.1976). The court found that the program-wide EIS "does not provide the detailed analysis of local geographic conditions necessary for the decision-maker to determine what course of action is appropriate under the circumstances." *Id.*, 388 F.Supp. at 838–39.

Subsequent to the *NRDC v. Morton* decisions Congress enacted comprehensive legislation intended to guide the BLM's management of public lands, including those used for grazing. The Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701–1782 gave the BLM organic authority and set out both general and specific policies and guidelines to be applied by the agency. The Public Rangeland Improvements Act (PRIA), 43 U.S.C. §§ 1901–1908, supplemented and refined FLPMA's range management provisions, and authorized funding for specific on-the-ground range improvements designed to reverse the widespread downward trend in range conditions.

Pursuant to the decision in *NRDC v. Morton* and the new statutes, the BLM undertook steps in the late 1970s to lay the groundwork for a comprehensive grazing management plan and EIS for the Reno area. The agency began gathering inventory data, listing the available resources in portions of the planning area. Agency specialists then began preparation of the Management Framework Plan (MFP), which is accomplished in three stages pursuant to agency regulations.[3] At the first stage, or MFP I, individual planning recommendations were compiled and explained or justified based on substantive law or agency policies. At the next stage, MFP II, the

---

**1.** An excellent capsule history of the BLM's management (or mismanagement) of grazing on public lands is contained in the opinion of Judge Ramirez in *Natural Resources Defense Council, Inc. v. Hodel,* 618 F.Supp. 848, 855–86 (E.D.Cal.1985). For more comprehensive academic treatment *see The Law of Public Rangeland Management II: The Commons and the Taylor Act,* 13 Envtl.L. 1 (1982).

**2.** References to the Administrative Record will be by the Volume number followed by page

number in the overall record, thus A.R. V: 494 would be Volume 5, page 494. When appropriate, other page references within certain documents, such as the Draft Environmental Impact Statement (DEIS) will be added for the convenience of the reviewing court.

**3.** The planning process is outlined in 43 C.F.R. § 1601.5 (1982), presently recodified with revisions at 43 C.F.R. § 1610.4 (1984).

agency attempted to identify and analyze resource conflicts between the various recommendations or uses. The MFP thus acts as a preliminary land use plan, striking some sort of balance among the competing pressures on the resources available. The MFP II for the Reno Planning Area was completed in mid-1981.

The MFP II then served as the "proposed action" within a draft EIS which was issued in July, 1982. The draft EIS ("DEIS") attempts to compare the "proposed action" with three other alternatives in terms of their environmental, economic, and social consequences. The plaintiffs herein took advantage of the opportunity to comment on the DEIS, and pointed out numerous perceived shortcomings. After purportedly considering these objections and considering the alternatives outlined, the BLM issued a Final Environmental Impact Statement (FEIS) which essentially incorporated the DEIS, and summarized the alternatives and predictions in tables. Also included were some minor corrections and copies of comments received relating to the DEIS. The "proposed action" was then adopted as the MFP III, or final land use plan for grazing in the Reno planning area on December 21, 1982.

The plaintiffs protested the adoption of the MFP III as a final agency action, first to the state BLM director, and then to the Director of the BLM. These protests were denied in all material respects. This lawsuit was then filed, in which plaintiffs challenge the adequacy of the EIS, as well as the substantive decision, the MFP III, as being contrary to law and applicable regulations. Plaintiffs' arguments will be discussed in approximately the same order as presented in their motion for summary judgment.

## ANALYSIS

### I. Violations of NEPA

#### A. MFP Decision Preceded EIS Process

In this argument, contained principally at pp. 20–22 of plaintiffs' memorandum in support of motion for summary judgment,

plaintiffs contend that the BLM had actually decided on its intended course of action before preparing an EIS and actually considering the alternatives. They contend that by predetermining the course of action to be taken, the BLM essentially reduced the process required by the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (1970), to the level of a meaningless, after-the-fact exercise.

■ "The purpose of NEPA is to assure that federal agencies are fully aware of the impact of their decision on the environment." *Friends of the Endangered Species v. Jantzen,* 760 F.2d 976, 985 (9th Cir.1985). Plaintiffs are thus correct in asserting, in theory, that preparation and consideration of an EIS should precede the adoption of the actual federal action proposed. *State of California v. Bergland,* 483 F.Supp. 465, 479 (E.D.Cal.1980), *affirmed in part State of California v. Block,* 690 F.2d 753 (9th Cir.1982). It does not follow, however, that an agency cannot formulate a proposed action, or even decide that it wishes to take the proposed action, before preparation of an EIS. Indeed, agency regulations contemplate the selection of a preferred course of action prior to completion and filing of the DEIS. 43 C.F.R. § 1601.5–F (1982). NEPA demands only that the agency follow certain procedural steps in evaluating the consequences of its action, and that the EIS itself comply with the general purposes of NEPA, by providing decision-makers with an analysis of the environmental effects of a proposed action, and to provide the public with such information and an opportunity to participate in gathering information. *Citizens for a Better Henderson v. Hodel,* 768 F.2d 1051, 1056 (9th Cir.1985).

There is no contention in this case that the BLM did not observe the procedural requirements of NEPA, in terms of the timing of its public announcements or the like. Moreover, there is no contention that the BLM *implemented* its proposed action prior to completion of the NEPA process. (Indeed, if one accepts the characterizations of the MFP III advanced by plain-

tiffs, the planned action involved virtually *no change over the status quo,* at least for the first several years of the plan period.) Rather, plaintiffs argue, in effect, that the BLM had decided that it liked the MFP III approach before it completed the NEPA/EIS process. In an ideal world, perhaps, agencies should refrain from any sort of policy decision until all environmental consequences have been fully analyzed. And perhaps the BLM can be validly criticized for operating in such a fashion in this case. But such policy-making criticisms do not rise to the level of NEPA violations, and none of the cases cited by plaintiffs so hold. I respectfully decline to indulge in the sort of administrative mind-reading that would be required under the theory advocated by plaintiffs in this section of their argument.

### B. EIS Fails to Analyze Specific Proposals or Alternatives

This section of the plaintiffs' NEPA argument contains many sub-arguments, some of which overlap with substantive challenges made to the MFP III plan itself. Generally, this section of plaintiffs' argument is addressed at the lack of specificity in the EIS as to both the proposed action (the MFP III) as well as the alternatives presented. At this point it would be helpful to briefly summarize the nature of the proposed action.

The MFP II first categorized each of the approximately 55 grazing allotments in the Reno Area into one of three categories, based on an evaluation of each allotment's resources, potential, trend, and other factors outlined in Appendix K to the DEIS. The three categories are *Maintenance* ("M"), *Improvement* ("I"), and *Custodial* ("C"). Although the criteria are quite detailed, the basic features of the categories are as follows. In "M" allotments, the BLM feels that ecological conditions are adequate or improving, that present management policies are satisfactory, and no drastic changes are required over the status quo. In "I" allotments, the ecological condition is fair to poor, with a

downward trend, there is the potential for improvement based on economically feasible measures, and present practices are not adequate to meet long term objectives. In "C" allotments, conditions are viewed as stable, but potential for improved productivity is limited, and there is little likelihood of cost-effective improvement.

The central feature of the MFP (which is the "proposed action" in the EIS) is to focus BLM efforts on the "I" category allotments. The plan calls for initially maintaining existing grazing levels for a period of about 5 years, and addressing problems on the "I" allotments through range improvements, grazing systems, and consultation with affected parties. This consultation and joint decision-making process is called Coordinated Resource Management and Planning, or CRMP in BLM jargon. (See DEIS at p. 1–16, A.R. VII: 804). The MFP also calls for further monitoring of the allotments so that adjustments in grazing levels, if necessary, can be undertaken at a later date. In the long term (beyond 5 years) the BLM plans to reduce grazing in the Reno Area by 30% (for livestock) and 20% overall (including all grazing species). (FEIS p. 8, A.R. VI: 634).

■ With this brief explanation of the proposed action clearly understood, we may thus proceed to analyze the EIS which evaluates it and its alternatives. In examining plaintiffs' specific arguments relating to the EIS, it is also important to remember the court's standard of review. As indicated above, the court's review under NEPA is basically two-tiered. The court first determines whether the procedural requirements of NEPA have been satisfied, and secondly whether the EIS fulfills the policies required by NEPA. *Citizens for a Better Henderson v. Hodel,* 768 F.2d at 1056. In evaluating the adequacy of the EIS under this second level, it must be remembered that the scope of the EIS is largely determined by the scope of the proposed action itself and the rule of reason. Courts, in construing NEPA do not throw the rule of reason overboard. Thus, where

the proposed action is vast in scope, covering a large project or program, NEPA's policy will obviously demand more from the EIS in the way of specificity and range of alternatives than where the proposed action is more modest in its scale. *See California v. Bergland*, 483 F.Supp. 465, 473 (E.D.Cal.1980). "Judicial review of the range of alternatives considered by an agency is governed by a 'rule of reason' that requires an agency to set forth only those alternatives necessary to permit a 'reasonable choice.' " *California v. Block*, 690 F.2d 753, 767 (9th Cir.1982), *quoting Save Lake Washington v. Frank*, 641 F.2d 1330, 1334 (9th Cir.1981). Keeping this standard of review in mind, as well as the scope of the proposed action, I now turn to the specific challenges raised by plaintiffs.

*1. A Proper Grazing EIS Must Allocate Forage on Each Allotment*

■ The general thrust of this argument is that the EIS must contain specific information as to each grazing allotment in the Reno planning area. Plaintiffs complain that the proposed action does not really describe specific, on-the-ground actions to be taken, but merely categorizes the allotments, and proposes that the BLM's main efforts will be focused on the "I" allotments. They point out, through their experts, that the basic components of range management are numbers of livestock, seasons of use, forage utilization levels, and grazing systems. (Plaintiffs' Memo in Support of Summary Judgment at p. 22). They further reason that because BLM regulations require each grazing permit to specify in detail the utilization level for each grazing allotment, a grazing EIS must contain an allotment-by-allotment specification of how the BLM proposes to permit grazing under the MFP as well as under each alternative.

When fully considered, plaintiffs' argument here emerges as really a complaint against the vagueness of the MFP itself, and not so much as an indictment of the EIS under NEPA principles. The legality of the MFP, of course, is challenged separately by plaintiffs and is discussed in depth *infra*. It is true that the proposed action does not promise any specific measures will be taken by any particular dates. As described in the DEIS at p. 1–4, the BLM intends to "continue to monitor", begin CRMP, propose possible adjustments in livestock levels, implement Allotment Management Plans (AMPS), and to implement grazing systems. All of these actions are, to some extent, hypothetical. The DEIS clearly explains the assumptions (DEIS at pp. 3–1, 2; A.R. VII: 839–40), including the assumption that the BLM will have the funding to carry out the specific actions eventually required under the MFP. Nevertheless, because the scope of the EIS is determined by the scope of the proposed action, it is unreasonable to expect the EIS to analyze possible actions in greater detail than is possible given the tentative nature of the MFP itself.

An EIS of the specificity sought by plaintiffs is also unreasonable on another ground. Basically, plaintiffs want the EIS to spell out stocking levels for each of the 55 or so allotments both in the near term, and in the long term, and under each of the four (and preferably more) alternatives. Plaintiffs are really seeking an EIS for each allotment. A document addressing the ecological and other impacts for each set of permutations of stocking levels would be a completely unmanageable undertaking. Under the "rule of reason" analysis discussed in *California v. Block, supra*, such a request must be denied.

Plaintiffs argue that the decision of the District of Columbia court in *NRDC v. Morton*, 388 F.Supp. 829 (D.D.C.1974) requires localized EIS's with the detail they seek, namely specific proposals and alternatives to govern each gracing allotment under the BLM's jurisdiction. I do not read the case that way. Indeed, Judge Flannery was careful to note in his opinion that "Plaintiffs do not ask that impact statements be filed for every license or permit issued or renewed by the BLM." *Id.*, 388 F.Supp. at 838. He repeated the same caution later in his opinion, 388 F.Supp. at 841. He clearly indicated that it

was to be within the discretion of the BLM to determine whether it wished to address the effects of gracing permits individually or in groups, on a district-wide basis. *Id.* The court stressed that the important consideration was that "the actual environmental effects of particular permits or groups of permits in specific areas" be addressed. *Id.* The EIS does that in the Reno planning area, and is consistent with the language of *NRDC v. Morton.*

### 2. Range of Alternatives Addressed is Inadequate

Plaintiffs make a number of sub-arguments in this section of their motion. The first is that the four alternatives presented in the EIS do not constitute a wide enough range of alternatives. Plaintiffs observe that, in the short run, three of the alternatives studied are identical in the amount of forage allocated to livestock. Only one alternative, the so-called "resource protection alternative", calls for any reduction in livestock grazing within the first five years. And even under that alternative, only the "I" allotments would be affected; grazing levels would remain the same on "M" and "C" allotments. (The "resource protection alternative" also involved some wild horse removal; *see* DEIS Table 1; A.R. VII: 770).

■ In analyzing these contentions it is worthwhile to repeat the basic principles of NEPA law that have already been mentioned. First, the scope of alternatives required to be analyzed is determined by the scale of the proposed action. *See California v. Block,* 690 F.2d at 767. Second, the range of alternatives must be weighed against the underlying purposes of NEPA: allowing a reasoned choice by the decision-maker and allowing informed participation by the public. *Citizens for a Better Henderson v. Hodel,* 768 F.2d at 1056; *see Kilroy v. Ruckelshaus,* 738 F.2d 1448, 1454 (9th Cir.1985) (EIS need not consider alternatives remote from reality.)

Plaintiffs rely heavily on comparisons drawn between the facts of this case and *California v. Block.* In the latter case the

Ninth Circuit largely affirmed the district court's conclusion that the range of alternatives discussed was not broad enough. In that case a number of alternatives for classification of wilderness areas were discussed, but the overall range of *results* under the various alternatives was narrow: only 34% of the total area was allocated to wilderness under the most liberal of the alternatives. Plaintiffs attempt to analogize this case to *California v. Block* both in terms of the number of alternatives discussed, and in terms of the range of results discussed. (The most liberal alternative in this case contemplates only a 30% reduction in total forage consumption in the short term.) I find these arguments unpersuasive.

■ The scope of the program in *California v. Block* was enormous in its consequences compared with the proposed action in this case. The program in *California v. Block* involved classification of some 62 million acres of roadless land for wilderness or other purposes, including decisions that could potentially be irreversible if development were allowed to proceed on erstwhile roadless areas. In this case the BLM proposed only a very modest departure from the status quo, as described earlier in this opinion. The land mass involved here is only about 1% of the amount of acreage at issue in *Block.* The MFP calls for ongoing adjustments in grazing levels through the CRMP process, to prevent damage as conditions warrant. Plaintiffs are correct in observing that three of the alternatives studied call for the same level of livestock use in the short run. They also correctly note that there is a "spread" of only about 30 percent in forage consumption among all alternatives. Nevertheless, I do not view these features as fatal under a "rule of reason" standard, given the nature of the proposed action in this case.

■ Plaintiffs make similar arguments about the long-term figures used in EIS. They observe that forage levels are only mentioned in summary fashion, and are not explained or analyzed in terms of grazing

permits on an allotment-by-allotment basis. The long-term forage levels are, to some extent, arbitrary since they depend on successful installation of the range improvements and grazing systems foreseen by the MFP. Nevertheless, they represent an acceptable range of alternatives, given the vagueness of the MFP itself.

Plaintiffs also attack the narrow range of forage allocations even under the summary figures used in the EIS. The percentage of forage allocated to livestock falls within a narrow range of 24%, as between the lowest and highest alternatives discussed. (FEIS at 8; A.R. VI: 634). This numerical figure, however, is not significant in the abstract. As revealed in the DEIS, the economic impacts on the ranching community would be significant in both the short-term and long-term aspects of the "resource protection" alternative. (DEIS at 3–23, 24; A.R. VII: 861–62). NEPA should not be read as to require alternatives even more extreme both in terms of monetary losses and job losses. Further, as the allowable amount of grazing is decreased, the value of the permits are also decreased, thus further reducing the funds available to the BLM to pay for the necessary physical range improvements, which are essential parts of all alternatives analyzed (except the No Action alternative.) Thus, while it is possible that the BLM could have analyzed an alternative plan allowing less grazing than any of the others indicated, it likely would not address the deteriorating range condition as effectively as the mix of choices set out in the EIS, particularly in the "resource protection" alternative.

Plaintiffs further complain that the environmental consequences of the four alternatives used evidences an inadequate range of options. They observe that the EIS predicts the same gross ecological changes (in terms of changes in condition class) under three of the four alternatives ("proposed action," "maximization of livestock," and "resource protection.") (DEIS at 5–29, 5–40; A.R. VII: 899, 910). Again, this coincidence means little in the abstract.

The four alternatives reflected a range of difference in management emphasis (A.R. VII: 770–71), cost (A.R. VII: 772, 778), public acceptance (A.R. VII: 779), and total allocated forage (A.R. VII: 770). The fact that the alternatives have similar outcomes by some criteria does not, by itself, establish a NEPA violation.

Plaintiffs finally argue, in this section of their motion, that the BLM was under an obligation to at least consider an alternative that attempts to redress the overall poor quality of the rangeland in the planning area. They point out that under all alternatives nearly half of the Reno area will remain in poor condition, and that "there will be continued overuse of unprotected riparian habitat by livestock and/or wild horses causing a decline in vegetation quality." DEIS 3–25; A.R. VII: 863. They further contend that this failure to address the possibility of more aggressive measures to improve the conditions generally constitutes a violation of Council of Environmental Quality (CEQ) regulations and the agency's substantive mandates.

Once again it bears repeating that alternatives must be viewed under a "rule of reason" and are to be measured against the scope of the proposed action. In this instance the proposed action is rather limited in scope, as are the alternatives. But the alternatives are reasonable ones, and do represent some improvement in overall land quality values over the long run. The "resource protection" alternative may not go as far as plaintiff would wish in remedying range conditions, but it is not reasonable to expect *any* feasible program to return all portions of the Reno area to their prehistoric native condition. Moreover, the fact that much of the area is expected to remain in "poor" condition does not have any implications for the type of management. The "poor" label refers only to the condition of the land relative to its "climax" ecological state, which is only a hypothetical and theoretical condition for most of the public land under BLM supervision. *See* DEIS at 5–21; A.R. VII: 891.

The fact that lands may be in a state below that of their aboriginal pristine condition is content neutral for policy purposes. The important characteristic is whether the lands are producing at or near their capacity, under multiple-use/sustained yield principles, as required by FLPMA and PRIA. *See* 43 U.S.C. §§ 1712(c), 1903(b). This includes productivity for livestock uses, which inherently involves a retreat from the land's native condition or ecological climax state. Thus the arguments raised by plaintiffs in this regard, while factually correct, do not represent NEPA violations. "Poor" ecological condition, as that term is used by the BLM, does not necessarily mean that management decisions or reasonable alternatives thereto have not accommodated the competing pressures on public lands, or that insufficient attention is being paid to environmental values.

### 3. EIS Should Have Considered a No-Grazing Alternative

 Plaintiffs here argue that the BLM's internal policies, as well as CEQ regulations, required the BLM to include in the EIS an alternative analyzing the effects of a complete ban on livestock grazing within the Reno area. I find this argument lacks merit.

This argument must be evaluated against the historical background of the Reno planning area, and against the regulations and case authorities that discuss the scope of alternatives that must be included for an EIS to be valid. First, it is an indisputable fact that livestock grazing has been going on in the Reno planning area, on public lands, for more than a century. (A.R. X: 1377). For better or worse, production of forage for livestock use is at least an important priority in the overall resource picture of this area. *Cf.* DEIS at 2–17–20; A.R. VII: 824–27. Second, the mandate of Congress in PRIA was that livestock use was to continue as an important use of public lands; they should be managed to maximize productivity for livestock and other specified uses. 43 U.S.C.

§ 1903. Third, NEPA does not require examination of alternatives that are so speculative, contrary to law, or economically catastrophic as to be beyond the realm of feasibility. *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1454 (9th Cir.1985); *California v. Block*, 690 F.2d 753, 767 (9th Cir.1982). The complete abandonment of grazing in the Reno planning area is practically unthinkable as a policy choice; it would involve monetary losses to the ranching community alone of nearly 4 million dollars and 290 jobs (DEIS at 2–20; A.R. VII: 827), not to mention unquantifiable social impacts, (*see* DEIS at 2–22; A.R. VII: 829). Of course, compared with the economy of the Reno area as a whole, ranching plays only a negligible role. Nevertheless, eliminating all grazing would have extreme impacts on this small community. A "no grazing" policy is simply not a "reasonable alternative" for this particular area. *Citizens For A Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir.1985).

A "no grazing" alternative is also not required by CEQ regulations that refer to a "no action" alternative, 40 C.F.R. § 1502.-14(d). The "action" that is proposed in this case is the MFP. As previously summarized, the MFP involves maintaining present livestock levels, continued monitoring, installation of range improvements, and improvement on those 10 or 11 allotments singled out for special attention. The "no action" alternative studied in the EIS is the correct "no action" alternative, as contemplated by the CEQ regulations, namely continuation of the status quo ante, in the absence of any of the proposed actions. "No action" in my opinion is certainly not, in this context, a complete reversal or abolition of a historical pattern of use over 100 years old.

Plaintiffs point to various informal agency memoranda and policy statements in their memorandum (PP. 37–38) indicating that the BLM would normally include a "no grazing" alternative in EISs. However, these promises are not enacted as agency regulations and the Bureau is legally free to change its mind, depending on how the political "wind blows" in Nevada and in the

nation as a whole. *See Dahl v. Clark,* 600 F.Supp. 585 at 590 (D.Nev.1984).[4]

In sum, "no grazing" is not the same as the "no action" alternative suggested by the CEQ regulations, nor is it such a manifestly "reasonable" alternative that the court can require its inclusion in the EIS as a matter of NEPA law. Although the BLM certainly *could* have included and studied it as an option, as it had earlier said it would, the failure to do so is not grounds for intervention by this court.

### 4. Failure to Include Estimates of Carrying Capacity in EIS

■ Here again plaintiffs attack a lack of specificity in the EIS, this time concerning the absence of site-specific estimates of grazing capacity. Plaintiffs first observe that grazing permits are required to specify "the kind and number of livestock, the period(s) of use, the allotment(s) to be used, and the amount of use, in animal unit months, that can be made. ..." 43 C.F.R. § 4120.2–1(a) (1982). The same regulation provides that authorized use may not exceed the livestock grazing capacity, given the objectives established for the allotment. *Id.* The same requirements are presently codified at 43 C.F.R. § 4130.6–1(a) (1984). Plaintiffs next observe that limiting the number of animals allowed to graze is one of the essential techniques of range management. They further reason that because NEPA and CEQ regulations require the EIS to contain all information necessary for informed decision-making and public participation, the EIS must contain the same detailed information as the BLM is required to put in its grazing permits. This conclusion does not follow.[5]

The "proposed action" (as well as the "no action" and "maximization of livestock") alternatives each propose to continue previous levels of authorized livestock use.

(DEIS at V.; A.R. VII: 770). Although the gross figure is not broken down by allotments, it is necessarily true that the figure (43,973 AUMs) represents the BLM's estimated grazing capacity for the entire Reno area. This is true because it represents the total of all of the allotments' authorized livestock use, none of which may individually exceed capacity under current regulations. Because existing regulations assure that authorized grazing will not exceed carrying capacity, none of the alternatives analyzed will result in the "vegetative destruction and overall resource deterioration" that plaintiffs fear. Although the BLM will have to use site-specific data in adjusting livestock levels through the CRMP process under the MFP, it does not necessarily follow that such data must be analyzed in the EIS, in precisely the same detail. Again, the specificity of the EIS is governed by the proposed action; the EIS is not an administrative blueprint designed to allow the public to second-guess every possible future decision that the agency may have to make.

### 5. EIS Does Not Adequately Describe the Proposed Action

[13] This argument really seems to be an elaboration of previous contentions, complaining about the lack of specificity in the EIS. The plaintiffs contend that the EIS must "accurately describe the 'federal action' being taken." *California v. Block,* 690 F.2d at 761. Plaintiffs seem to feel that the EIS does not fully explain why the proposed action (at that stage, the MFP II) reached the compromises and tradeoffs that it did. (*See* plaintiffs' memo at p. 45).

It is true that the DEIS does not explicitly detail the BLM's underlying reasoning, or forthrightly explain at any one place why the proposed action is felt to be superior to the other alternatives. This is perhaps confusing to the casual reader, who

---

**4.** Judge Reed, at page 590, seems to have been faithful to Justice Frankfurter's dictum in *Watts v. State of Indiana* (1949), 338 U.S. 49 at 52, 69 S.Ct. 1347 at 1349, 93 L.Ed. 1801 that we "should not be ignorant as judges of what we know as men [and women]."

**5.** Leaping to that sort of conclusion from premises such as these is an exercise in which I decline to take part unless and until I am told by the Court of Appeals or the Supreme Court that I must.

might observe that the proposed action is possibly more expensive than the "resource protection" alternative (DEIS p. xiii; A.R. VII: 778), results in less livestock grazing in the long run (DEIS p. v; A.R. VII: 770), and less overall improvement in ecological condition. (DEIS p. 3–25; A.R. 863). Nevertheless, after a thorough and painstaking review of the EIS the reader understands that there are so many different tradeoffs and permutations of tradeoffs involved that no single explanation could fully justify every aspect of the MFP. The reader is left only with the impression that the BLM took its best cut at addressing the areas that it felt were in the most immediate need. It is also clear that subjective factors came into play, including the BLM's obvious desire to maintain for ranchers, what it describes (romantically perhaps) as a "preferred lifestyle." (DEIS p. 3–23, 2–22; A.R. VI: 829, 861.) I believe that the DEIS adequately conveys to anyone who reads it in depth the reasons for (and the tradeoffs behind) the proposed action.[6]

### I. The MFP Allows Continued Resource Deterioration, Contrary to Statute

[14] In this section of the case, plaintiffs argue that the BLM has violated a number of statutory and regulatory provisions in its management of the Reno area. They argue that substantive mandates require the BLM to curb overgrazing, and to take affirmative actions to remedy past degradation of public rangelands. They conclude that because the BLM has not taken strong enough action in these matters that this court should intervene, overturning the MFP and directing the agency to take steps more in line with plaintiffs' interpretations of the law.

Although plaintiffs' brief glosses over this point, it is important to remember that the procedural vehicle being used to challenge the MFP and the BLM's practices generally is the Administrative Procedures Act, 5 U.S.C. § 706. (See Complaint ¶ 43). In reviewing an agency decision, such as the MFP, the Ninth Circuit applies the standard set forth in § 706(2)(A): whether the administrative action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Garrett v. Lehman,* 751 F.2d 997, 999 n. 1 (9th Cir.1985). Courts are obliged to give deference to the interpretation of a statute by the agency charged with administering it. *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Nevertheless, courts are the final authorities on issues of statutory construction. "We must reject administrative constructions that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Southern California Edison Co. v. Federal Energy Regulatory Commission,* 770 F.2d 779, 782 (9th Cir.1985).

Of particular relevance to the standard of review in this case is *Perkins v. Bergland,* 608 F.2d 803 (9th Cir.1979). In that case, two grazing permittees challenged the Forest Service's decision regarding the appropriate grazing levels on their allotments. Judge Goodwin's opinion rejected the contention that the general policies and objectives contained in the statute (the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528 *et seq.*) supplied useful standards for a court to apply on judicial review under the Administrative Procedure Act. The court concluded that "only very narrow review is appropriate" for such decisions, namely whether the methodology used by the agency was "irrational." Elaborating further, the court said that to carry this burden the "contesting party must

---

**6.** The "in depth" reading mentioned here may involve some reading "between the lines" of the DEIS. Why the agency would propose a course of action that can, with little effort, be seriously criticized as being more expensive, resulting in less long-run environmental improvement, and even less grazing in the long run can only be the source of speculation to the outsider. Certainly

one obvious explanation is that the BLM performed an administrative policy pirouette under the baton of Secretary Watt around 1981, essentially deciding to postpone any grazing reductions indefinitely. *See Dahl v. Clark,* 600 F.Supp. 585, 589 (D.Nev.1984), discussed in more detail *infra.*

show that there is virtually no evidence in the record to support the agency's methodology in gathering and evaluating the data." *Perkins v. Bergland,* 608 F.2d at 806, 807.

Attempting to keep these principles of review in mind, we may now approach the plaintiffs' challenges to the MFP and the decisions surrounding it.

### A. BLM Has Failed to Curtail Overgrazing

Plaintiffs first correctly point to the legislative histories of the Taylor Grazing Act, FLPMA, and PRIA, to demonstrate Congress' general concern about overgrazing by livestock, and to indicate that reductions in livestock levels were one of the methods mentioned by Congress to prevent further deterioration of rangelands. Plaintiffs then cite portions of the record, including the DEIS, which indicate that there has been overuse of some portions of the Reno area by livestock. (*See* plaintiffs' memo in support of summary judgment at pp. 48–51). The conclusion plaintiffs say should then follow is that BLM has violated the law, and that the relatively modest improvements predicted from the MFP are insufficient to comply with the statutory mandates.

The facts established by the enormous record in this case do show that there has been overgrazing in the Reno area, but that in only four allotments could it be *conclusively* determined that the overgrazing was due to livestock use. (Supplemental Affidavit of Edward Spang ¶ 5). On eight allotments the overuse could have resulted from a combination of livestock, deer, and wild horses; on the three remaining allotments there was no livestock grazing whatsoever. Thus, overgrazing due to livestock was not endemic to the entire Reno area.

A second important point to note in this context is that even where overgrazing is found to exist, the remedy is not necessarily the immediate removal of livestock. I give due weight to the proposition put forth by defendants' experts that other methods, such as vegetation manipulation and seeding, fencing, water development, or other range improvements or grazing systems may serve to address problems of selective overgrazing without a mandatory reduction in livestock use. (*See* Heady and Spang affidavits *passim.*) While reductions in AUMS for livestock may be one accepted method of addressing range deterioration, as recognized by Congress (*see* 43 U.S.C. § 1903(b)), it is not the only method.

A third important point here concerns the quality of data available to the BLM for making livestock management decisions. Although this issue will be discussed in more detail below, the BLM reached the decision that in order to defend its actions against attack from ranching interests it would need a solid data base upon which to ground livestock reduction orders. The wisdom of this decision is supported in part by such cases as *Dahl v. Clark,* 600 F.Supp. 585 (D.Nev.1984) and *Perkins v. Bergland,* 608 F.2d 803, 807 (9th Cir.1979). As explained by defendants' experts, in order for the BLM to be certain of the proper livestock carrying capacity of a given allotment the agency must have: 1) actual use data (what kinds of animals grazed where and for how long), 2) how much vegetation has been consumed (utilization data), and 3) the overall effect of the specified grazing (trend). (*See* Spang Affidavit p. 11). The BLM said it lacked the first type of data for much of the Reno area and felt (at least after 1981) that in its absence it should refrain from immediate changes in livestock numbers, and concentrate its efforts on other techniques of range management.

Plaintiffs claim that the BLM is allowing overgrazing to continue. In reality, however, their complaint is with the *methods* selected by the BLM to allocate the resources within its control. Rather than immediate reductions in livestock numbers, the BLM chose to install range improvements and grazing systems on the areas ("I" allotments) that the BLM says are in need of the greatest attention. Moreover, the MFP does call for a significant reduc-

tion in livestock numbers, although this is to take place over a longer period of time than plaintiffs insist on. (DEIS at p. v; A.R. VII: 770). Finally, the MFP is predicted to bring about an overall improvement in the rated quality of many of the allotments. (DEIS at ix; A.R. VII: 774). In sum, it is not entirely certain that the BLM has allowed continued overgrazing or deterioration of resources, in violation of statutory mandates.

### B. PRIA Claims: Rangeland Improvement

The converse argument is also put forward by plaintiffs in this section of their case, namely that the BLM is violating the affirmative mandates of PRIA by failing to assure the *improvement* of the public rangelands. As noted immediately above, however, the MFP does result in limited improvements in overall ecological and forage conditions in the Reno area. Plaintiffs characterize the BLM's management as "do nothing", but in reality it appears that the real argument is that the BLM does not do what plaintiffs want, namely redress range conditions through immediate reduction or elimination of livestock grazing.

It must be noted that it is yet too early for a court to evaluate a claim that the BLM has not complied with its own plan, or that it has not taken the steps promised in the MFP. The plan refers to various range improvements that are expected to remedy selective overgrazing, but does not provide a timetable for their installation. If it did appear after five or more years' time under the MFP that BLM was not taking even the limited steps promised thereunder, then a request for relief (injunctive or perhaps even mandamus) would seem likely to meet little, if any, judicial reluctance to order

performance of the planned improvements and livestock reductions. However, I do not understand plaintiffs to be making such arguments, which would be premature at this time.

Plaintiffs argue that FLPMA and PRIA provide "standards" against which the court can determine whether the MFP is "arbitrary, capricious or contrary to law." The declarations of policy and goals in 43 U.S.C. §§ 1701(a), 1732, 1901, 1903 and ancillary provisions contain only broad expressions of concern and desire for improvement. They are general clauses and phrases which "can hardly be considered concrete limits upon agency discretion. Rather, it is language which 'breathes discretion at every pore.'" *Perkins v. Bergland,* 608 F.2d at 806, *quoting Strickland v. Morton,* 519 F.2d 467, 469 (9th Cir. 1975).[7] Although I might privately agree with plaintiffs that a more aggressive approach to range improvement would be environmentally preferable, or might even be closer to what Congress had in mind, the Ninth Circuit has made it plain that "the courts are not at liberty to break the tie choosing one theory of range management as superior to another." *Perkins v. Bergland,* 608 F.2d at 807. The modest plans adopted by the BLM for dealing with range conditions in the Reno area are not "irrational" and thus cannot be disturbed by the court.

### III. The MFP's Failure to Allocate Forage Violates FLPMA and PRIA

■■■ The real question posed in this section of the case is what are BLM land use plans supposed to look like? That is, what kind of detail must the MFP contain to qualify as a legitimate land use plan re-

---

**7.** I do not mean to suggest from this language that because the agency is given discretion to determine a preferred approach to range management, it implies there is "no law to apply" within the meaning of *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Such a conclusion would mean that there is no judicial review *at all. City of Santa Clara v. Andrus,* 572 F.2d 660, 666 (9th Cir.1978). However, we

know from FLPMA that judicial review is indeed available for this type of decision, albeit under a narrow standard. *Perkins v. Bergland,* 608 F.2d at 807. Further, I emphasize that given the result attached here, I have simply *assumed* that parties withstanding may seek judicial review under PRIA, Pub.L. 95–514, §§ 2(b) and 4(b), 43 U.S.C. §§ 1901(b) and 1903(b); 43 U.S.C. § 1701(a)(6).

quired by Congress? FLPMA and PRIA refer to the importance of land use planning in several places. *See* 43 U.S.C. §§ 1701(a)(2), 1712, 1732(a), 1901(b). But nowhere in the statutes did Congress describe in detail what sort of information must be included in a land use plan.

Some light on the Congressional intent emanates from the legislative history of FLPMA. In describing Section 202 of the Act (43 U.S.C. § 1712) the House Report notes:

> The term "land use planning" is not defined in bill because it is a term now in general usage and permits a large variety of techniques and procedures and various alternatives. The Committee is well acquainted with the land use planning systems of the Bureau of Land Management and the Forest Service and has found them to be consistent with the objectives of H.R. 13777. Both systems treat land use planning as dynamic and subject to change with changing conditions and values.

H.R. 94–1163 p. 5, 94th Cong.2d Sess. (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News pp. 6175, 6179. The BLM regulations in effect at that time called for District Managers to determine the "grazing capacity" of each unit or area, and to determine the proper seasons of use for allotments. 43 C.F.R. § 4111.3–1(a) (1976). The regulations also prohibited grazing in excess of capacity, as they do today. *See* 43 C.F.R. § 4115.2–1(e)(3) (1976). However, no regulations at that time governed long term planning of the type contemplated by FLPMA. It is therefore a reasonable assumption that Congress intended the BLM to continue its practice of setting grazing capacity at the permit-decision stage, and that land use planning (as required by 43 U.S.C. § 1712) deal with broader issues. These broader issues might include long-term resource conflicts, long-term range trends, planning of range improvements, and concentrating the BLM's limited resources on certain key areas.

This is the type of planning adopted by the BLM in this case. Clearly, the agency will continue to set grazing capacity on an on-going basis when it issues or renews grazing permits or licenses. A land use plan need not encompass every localized decision that must be made in the foreseeable future. Indeed, the legislative history indicates that Congress recognized "land use planning as dynamic and subject to change with changing conditions and values." H.R. 94–1163 p. 5, 1976 U.S.Code Cong. & Ad.News p. 6179, *supra.*

The present BLM regulations cited by plaintiffs do not compel a contrary interpretation. That plans are "designed to guide and control future management decisions," 43 C.F.R. § 1601.0–4 (1984) does not mean that the plan itself must *contain* the future decisions. Similarly, that a plan should contain "allowable resource uses ... and related levels of production or use to be maintained," "resource condition goals and objectives," "program constraints and general management practices" and so on, 43 C.F.R. § 1601.0–5(k) (1984), does not necessarily mean that the *plan* itself must allocate forage on each individual allotment for each year of the planning period. The MFP does set overall limits on grazing. BLM district managers know that overall use by livestock and by other consumers must not exceed the limits set in the Proposed Action alternative in the DEIS, (DEIS, p. 8; A.R. VI: 634). They know that after the first five years they must begin reducing livestock AUMs to meet the 30,618 level they have set as a long term goal, and that total consumption must not exceed 59,344 AUMs for all species. If they fail to take these long term limits into account in issuing grazing permits after the first five years of the plan then they may be liable to an enforcement action by plaintiffs, or others with a similarly deep concern for the environment.

The MFP also contains detail regarding miles of fencing, water troughs, wells, gabions, pipelines, cattleguards, etc. (*See* DEIS at vii; A.R. VII: 772). The proposed action also requires implementation of Allotment Management Plans on the "I" cate-

gory allotments. These sorts of broad, objective-oriented statements seem to be the proper material for land use planning. They are concrete enough to permit the public (including plaintiffs) and Congress to know what the BLM intends to do with its grazing lands, what improvements are needed, and a very rough timetable for their implementation. FLPMA and PRIA demand no more. The type of "planning" envisioned by plaintiffs, wherein the plan would effectively contain allotment management plans for each unit in the Reno area, allocating forage to each consumer species for each of the next ten years or more, is not a plan. It is an administrative straight-jacket which eliminates the room for any flexibility to meet changing conditions. In the absence of more directive legislation, or mandate from my appellate superiors, I will not command such a requirement. It is not up to me to legislate any more than it is up to me to administer.

## IV. Failure to Utilize Available Resource Data

In this section of the case plaintiffs challenge the BLM's decision to eschew the use of available inventory and monitoring data for purposes of setting grazing levels on the various allotments in the Reno area. This argument is based on the APA, and seeks to reverse the BLM's policy decision in this area as being arbitrary, capricious, and contrary to law. 5 U.S.C. § 706(2)(A).

To begin with, much of the importance of this argument is rendered moot by the above discussion. Although the BLM is required to determine grazing capacity at the time it issues grazing permits and prepares Allotment Management Plans, this opinion has found that such determinations are not essential to a valid land use plan (MFP). It similarly follows that if such specifications are not essential to a valid area wide land use plan (MFP), they do not need to be included in an EIS that evaluates the plan and compares it to other alternatives. Nevertheless, a brief discussion will demonstrate why this contention lacks merit on its own.

Defendant's memorandum in support of summary judgment (pp. 30–37) and the affidavits of defendants' experts submitted in support of the motion, are persuasive in refuting the notion that there is such a thing as an *a priori* "carrying capacity" or grazing capacity for any one piece of land. Consider a hypothetical allotment which could support 100 head of cattle in one year, and not show signs of downward trend. However, in the following year, depending on only one variable such as climate the same allotment could perhaps support only 80 head. Cf. *Hinsdale Livestock Co. v. United States*, 501 F.Supp. 773, 777 (D.Mont.1980). Conversely, with the addition of certain range improvements that would improve dispersal of the livestock on the allotment, the same parcel could in the following year perhaps support 120 head without signs of deterioration. Each of these permutations could be further affected by other variables such as usage by wild horses, or mule deer, precipitation or temperature patterns, seeding, encroachment of inferior types of forage, changes in seasons of use, and so on. *See* Burkhardt Affidavit at pp. 3–4, 6–7; Supplemental Burkhardt Affidavit at pp. 2–4. Unrealistic, then, is plaintiffs' theory that there is a fixed and immutable level of acceptable livestock use that can be administratively determined for years into the future.

It is true that around the time the MFP was being formulated the BLM had accumulated a substantial body of inventory and trend data regarding the condition of the Reno planning area. One major source of this data was the Soil Vegetation Inventory Method (SVIM) of determining range condition. As described in the first Spang Affidavit (and at other places in the record), SVIM essentially involved sampling a number of small plots of ground (about 9 square feet), so as to learn the number of plant species and thus the vegetation condition and carrying capacity of the entire allotment through the use of a sophisticated computer program. As indi-

cated in the DEIS at p. 5–23 (A.R. VII: 893) the SVIM data was not ultimately used by the BLM because it yielded inconsistent results. The meaning of these inconsistencies was explained by the BLM's experts, as being due in part to an insufficient number of samples, errors in identifying plant species, and assumptions built into the model. *See* Spang Affidavit at pp. 4–9. Essentially, the SVIM results were not accurate, when compared with what BLM staff knew to be the case on various allotments.

Although the BLM had trend data for most of the area, such data alone is not useful for setting livestock grazing levels because a declining trend can be due to a wide number of factors, only one of which is overuse by livestock. Further, although the BLM had some utilization data (showing how much forage was consumed in a given plot), it was not able to conclusively determine actual use by livestock. The actual use by real numbers of cattle is not always the same as the authorized use contained in permits. *See* Spang Affidavit p. 11.

Because of these and other difficulties, the BLM decided to revamp its methodology of setting grazing levels, based primarily on continued monitoring over longer periods of time, and not based on one-point-in-time studies such as SVIM. A new monitoring system for Nevada was developed by a joint task force and was adopted in 1981. (A.R. IX: 58). It is a coincidence that this change in methodology took place around the time that Mr. Watt became Secretary of the Interior, and the ultimate result of the decision was the continuation of existing grazing levels in the Reno area. But there is no direct evidence in this record that the change in methodology was primarily prompted by a political decision to postpone any adjustments in allocation that would adversely affect ranching interests.

In this connection, plaintiffs rely heavily on *Dahl v. Clark*, 600 F.Supp. 585 (D.Nev. 1984). In that case plaintiffs were holders of grazing permits who sought a writ of mandamus to compel the BLM to reduce the number of wild horses being allowed to graze on their allotments. The BLM defended on the ground that the data which had been accumulated for at least the last 10 years preceding 1981 (and the conclusions drawn from that data) were unreliable and could not be used to accurately determine range conditions. That case was tried to the court in a lengthy proceeding held in Elko, at which numerous range experts and witnesses were examined concerning the allegations of range deterioration. Evidence was also presented regarding a decision by then Secretary of the Interior James Watt, directing the BLM to change its methodology of evaluating range conditions, and to keep livestock and wild horse levels at the 1981 level while new studies were being carried out. *Id.,* 600 F.Supp. at 589, 590.

After hearing all the testimony in that case and weighing the credibility of the evidence, my brother Judge Reed found, as to those particular allotments, that the decision to ignore the findings of all prior studies was arbitrary and not in compliance with the Wild Horse Act, 16 U.S.C. § 1333(b), and BLM regulations. *Id.,* 600 F.Supp. at 592–93. Despite that conclusion, however, he denied the relief sought on the merits. The reason for this was that the court was unable to extract from the statutes or regulations any clear standard or numbers by which to measure the appropriate reductions in wild horse use. *Id.,* 600 F.2d at 595–96.

 I have reached a similar conclusion in this case, although my route has been different. If it were possible to glean more precise standards from the statutes or regulations, against which these policy decisions could be measured, then I might be more able to discern a pattern of illegal or arbitrary conduct, and to fashion appropriate relief. That is not the case before me. The Ninth Circuit has cautioned that a "trial court must refrain from entering that fray if it turns out that the [plaintiffs'] position would require a choice between experts." *Perkins v. Bergland*, 608 F.2d

at 807. The administrative record in this case does at least contain plausible support for defendants' position that existing monitoring data for the Reno area was not reliable for purposes of setting fixed grazing levels. While the BLM probably *could* have made defensible livestock adjustments where their data showed overutilization, poor range condition, and downward trend, this court cannot say it was "irrational" for them to refrain from doing so without the sort of monitoring data they desired. At this point, judicial inquiry is at an end. *Id.*

Defendants' response to plaintiffs' motion for summary judgment also contains other arguments to distinguish the holding in *Dahl* from this case. (*See* defendants' memorandum at pp. 18–20.) The only additional point that deserves mention here is the fact that *Dahl* involved a full scale trial, in which the court was able to make useful credibility judgments about the opinions of purported experts and the weight of the evidence generally. No such trial was sought by either side in this case, at least by the time the instant motions were ready for submission. In this procedural posture I am frankly unable to attempt the fine evaluation and weighing that would even bring me close to deciding that the BLM's decision was irrational. Based on the record before me, there seems to be a "rational" explanation for the Secretary's decision regarding monitoring data. Whether it was the best decision, or the only logical decision, is a matter for academic and political debate. It is not a "fray" that I may enter, absent direction from the Court of Appeals.

CONCLUSION

This was an extremely difficult and technical case, and both sides are to be commended for the high quality of lawyerly effort expended in attempting to guide the court through a largely uncharted legal minefield. The complexity also explains, in large part, the length of time taken to resolve these issues. For any undue delay in issuing this ruling I hereby express my keen regret.

After considerable thought and deliberation, I have come to the conclusion that the role plaintiffs would have me play in this controversy is an unworkable one. Plaintiffs are understandably upset at what they view to be a lopsided and ecologically insensitive pattern of management of public lands at the hands of the BLM, a subject explored at length by many commentators. Congress attempted to remedy this situation through FLPMA, PRIA and other acts, but it has done so with only the broadest sorts of discretionary language, which does not provide helpful standards by which a court can readily adjudicate agency compliance.

Boiled down and stripped of legalese [8] this is a case in which plaintiffs ask me to become—and defendants urge me not to become—the rangemaster for about 700,000 acres of federal lands in western Nevada. For some reason, over the past 15 years or so, I and many of my Article III colleagues have become or have been implored to become forestmasters (*Miller v. Mallery*, 410 F.Supp. 1283 (D.Or.1976)), roadmasters (*Ventling v. Bergland*, 479 F.Supp. 174 (D.S.D.1979)), schoolmasters (*Anderson v. Central Point School District*, 554 F.Supp. 600 (D.Or.1982)), fishmasters (*Washington Trollers Association v. Kreps*, 466 F.Supp. 309 (W.D.Wash. 1979)), prisonmasters, (*Capps v. Atiyeh*, 495 F.Supp. 802 (D.Or.1980), 559 F.Supp. 894 (D.Or.1982), watermasters (*Sierra Club v. Andrus*, 610 F.2d 581 (9th Cir. 1979)), and the like. This trend has not escaped the notice and criticism of academic commentators.[9]

That criticism has been based upon observations which include lack of training and expertise, lack of time, lack of staff

---

**8.** This litigation has brought forth a confounding number of acronyms such as FLPMA, PRIA, SVIM, URA, AMP, and CRMP (pronounced either "cramp," "crimp," or "crump") and MFP (which I assure the reader is unpronounceable.)

**9.** See, e.g. D. Horowitz, The Courts and Social Policy (1977); The Role of the Courts in American Society, Ch. 3, Council on the Role of the Courts (1984, West Pub. Co.)

assistance, and similar conditions. At bottom, however, the primary reason for the large scale intrusion of the judiciary into the governance of our society has been an inability or unwillingness of the first two branches of our governments—both state and federal—to fashion solutions for significant societal, environmental, and economic problems in America. Frankly, I see little likelihood that the legislative and executive branches will take the statutory (and occasional constitutional) steps which would at least slow, if not reverse, this trend. Fortunately, for reasons set out in this opinion which (to me) are legally correct, I am able to resist the invitation to become western Nevada's rangemaster.

Plaintiffs' motion for summary judgment is denied in its entirety, and defendants' motion for summary judgment is granted. The action will be dismissed. The clerk will enter judgment accordingly. No costs to either side.

IT IS SO ORDERED.