NATURAL RESOURCES DEFENSE COUNSEL, INC.; Sierra Club; Nevada Outdoor Recreation Association, Inc., Plaintiffs-Appellants,

v.

Donald P. HODEL, as Secretary of the United States Department of the Interior; Robert F. Burford, Director, Bureau of Land Management; Edward F. Spang, Nevada State Director, Defendants-Appellees.

No. 86–1687.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1986.

Decided June 15, 1987.

David B. Edelson and Johanna H. Wald, San Francisco, Cal., for plaintiffs-appellants.

John T. Stahr, Washington, D.C., for defendants-appellees.

Before POOLE, HALL and WIGGINS, Circuit Judges.

POOLE, Circuit Judge:

The Natural Resources Defense Council, the Sierra Club, and the Nevada Outdoor Recreation Association (collectively referred to as NRDC) brought suit challenging the environmental impact statement (EIS) and land use plan issued by the Bureau of Land Management (BLM) concerning livestock grazing on public lands in the Reno, Nevada area. The district court granted summary judgment for the BLM in a published opinion dated December 30, 1985. *NRDC v. Hodel*, 624 F.Supp. 1045 (D.Nev.1985). We affirm on the basis of that published opinion.

## FACTS

The BLM manages approximately 171 million acres of federal lands in 11 western states. The BLM was entrusted with this management responsibility by the Taylor Grazing Act, 43 U.S.C. §§ 315 to 315o-1 (1982). For the purpose of supervising livestock grazing on these lands, the BLM divides the lands into grazing districts, which are subdivided into planning areas. These planning areas are further subdivided into grazing allotments, for which the BLM issues grazing permits. This case deals with the 5 million acre Reno planning area, which includes some 700,000 acres under BLM supervision.

In the leading case in this area, *NRDC v. Morton*, 388 F.Supp. 829 (D.D.C.1974), *aff'd*, 527 F.2d 1386 (D.C.Cir.), *cert. denied*, 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976), a single EIS which the BLM had prepared for its entire livestock grazing program was rejected as inadequate under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4347 (1982). The reason for rejection was that the program-wide EIS did not provide "the detailed analysis of local geographic conditions necessary for the decision-maker to determine what course of action is appropriate under the circumstances." *Id.* at 838–39. The *Morton* court held that NEPA required assessment of the environ-

mental effects of particular permits or groups of permits in specific areas, although it emphasized that it was not requiring preparation of an EIS for each grazing permit. *Id.* at 841.

After the decision in *Morton*, Congress enacted the Federal Land Policy and Management Act of 1976 (Land Policy and Management Act), 43 U.S.C. §§ 1701-1782 (1982), to guide the BLM's management of grazing and other activities on public lands. That act states that it is the policy of the United States that present and future use of public lands be projected through a land use planning process. *Id.* at § 1701(a)(2). The act lists criteria for developing and revising land use plans, including observation of multiple use and sustained yield principles, and the giving of priority to the protection of areas of critical environmental concern. *Id.* at 1712(c)(1)–(8). Congress also enacted additional legislation, the Public Rangelands Improvement Act of 1978 (Rangelands Act), 43 U.S.C. §§ 1901-1908 (1982), to supplement and refine the Land Policy and Management Act. It did so by authorizing additional funding for on-the-ground range rehabilitation, maintenance and the construction of range improvements. *Id.* at § 1904.

In the late 1970's, the BLM began gathering inventory data and listing available resources, laying the groundwork for a comprehensive grazing management plan and EIS for the Reno planning area. The BLM then drafted the first Management Framework Plan (Plan I), in which individual planning recommendations were compiled and justified based on substantive law or agency policies. Subsequently, the BLM drafted a second land use plan (Plan II), which attempted to identify and analyze resource conflicts between various recommendations or uses.

Plan II then served as the "proposed action" within a draft EIS which was issued in July 1982. The draft EIS compared the "proposed action" with three alternatives denominated as "no action," "resource protection," and "maximization of livestock." After purportedly considering public commentary, the BLM issued a final

EIS, which essentially incorporated the draft EIS. In December 1982, the "proposed action" was adopted as Plan III, or final land use plan for grazing in the Reno planning area.

The final land use plan places each of the approximately 55 grazing allotments contained within the Reno planning area into one of the following three categories: (1) *Maintenance,* for allotments which are in adequate ecological condition, and for which present management policies are satisfactory; (2) *Improvement,* for allotments which are in fair to poor ecological condition but have potential for improvement, and for which present management practices are not adequate to meet long term objectives; and (3) *Custodial,* for allotments which are in stable ecological condition but with limited potential for improvement. The plan focuses BLM efforts on allotments in the Improvement category, by initially allowing grazing to continue at existing levels, while attempting to effect improvement through range improvements, monitoring, and consultation with affected parties. The plan called for continued monitoring of the allotments so that adjustments in grazing levels could be made later as needed.

The NRDC protested the adoption of Plan III as a final agency decision to both the state BLM Director and the Director of the BLM. These protests were rejected. The NRDC then filed suit in federal district court, challenging the adequacy and legality of the EIS and final land use plan. The district court granted the BLM's motion for summary judgment, and denied the NRDC's motion for summary judgment. The NRDC timely appealed.

### DISCUSSION

We review the district court's grant of summary judgment *de novo. Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 981 (9th Cir.1985).

■ By contrast, the standards of review which the district court was bound to apply in reviewing the EIS and final land use plan are deferential. The standard which a district court must apply in assess-

ing the adequacy of an EIS is two-fold. First, under the Administrative Procedure Act, NEPA's procedural requirements must be observed. *Citizens for a Better Henderson v. Hodel,* 768 F.2d 1051, 1056 (9th Cir.1985); *see* 5 U.S.C. § 706(2)(D) (1982). Second, the court must determine whether the EIS accomplishes its purpose, which is both to provide decision makers with enough information to assist them in deciding whether to proceed with a project in light of its environmental consequences, and to provide the public with information and the chance to participate in gathering information. *Citizens for a Better Henderson,* 768 F.2d at 1056. We have emphasized that this standard requires the court to make a pragmatic judgment as to whether the EIS promotes informed decision-making and public participation, without substituting its judgment for that of the agency concerning the wisdom or prudence of a proposed action. *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982).

■ The standard which the district court was bound to apply in assessing the validity of the final land use plan is whether this agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1982). We have pointed out that the scope of judicial review under this standard is narrow, and that a reviewing court may not substitute its judgment for that of the agency. *Lathan v. Brinegar,* 506 F.2d 677, 692–93 (9th Cir.1974). Moreover, an agency's interpretation of the statutes it administers, or of its own regulations, is entitled to deference, although the courts are the final authorities on issues of statutory or regulatory construction. *See Southern California Edison Co. v. FERC,* 770 F.2d 779, 782 (9th Cir.1985); *McCoog v. Hegstrom,* 690 F.2d 1280, 1284 (9th Cir. 1982).

Here, the district court concluded that the BLM had not violated NEPA by adopting a course of action prior to preparation of the EIS. *NRDC v. Hodel,* 624 F.Supp. at 1049–50. It further concluded that neither NEPA nor the *Morton* decision re-

quired the EIS to contain specific proposals and alternatives for each of the 55 grazing allotments within the Reno planning area, as suggested by the NRDC. The court held that the range of alternatives presented in the EIS was sufficiently broad to satisfy NEPA, and that inclusion of a "no grazing" alternative was not required under NEPA or applicable federal regulations. *Id.* at 1051–54. The court also held that neither NEPA nor federal regulations required inclusion of site-specific estimates of grazing capacity in the EIS, and that the EIS adequately described the proposed action. *Id.* at 1055–56.

Similarly, the district court rejected the NRDC's arguments that the final land use plan allowed continued overgrazing and failed to assure improvement of public rangelands in violation of the Land Policy and Management Act and the Rangelands Act. *Id.* at 1057–58. Moreover, it held that the plan was sufficiently detailed, and need not determine grazing capacity or allocate forage for each individual allotment in order to satisfy the Land Policy and Management Act, the Rangelands Act, and BLM regulations.[1] *Id.* at 1059–60. Finally, the court concluded that the BLM's policy decision to eschew the use of available inventory and monitoring data for purposes of setting grazing levels on the various allotments in the Reno area was not arbitrary, capricious, or contrary to law. *Id.* at 1060–62.

Reduced to its essence, the NRDC's challenge to the EIS and the final land use plan is a challenge to the BLM's policy decision to postpone livestock grazing adjustments until reliable data was available. While we sympathize with the NRDC's strong desire to preserve the environment, we agree with the district court that we cannot label this policy decision as either

irrational, or contrary to law. Thus, "[a]t this point, judicial inquiry is at an end." *Id.* at 1062.

Having thoroughly reviewed the district court's thoughtful opinion, as well as the NRDC's challenges to that opinion on this appeal, we conclude the court properly applied the governing standards of review to arrive at reasonable conclusions. Accordingly, substantially as set forth in Judge Burns' published opinion, we affirm.

AFFIRMED.

---

1. The NRDC complains that the district court incorrectly assumed that the BLM sets grazing capacity on an on-going basis when it issues or renews grazing permits or licenses. We agree with the BLM that this assumption was not essential to the district court's conclusion that the Land Policy and Management Act and Rangelands Act "demand no more" than broad, objective-oriented land use plans. *NRDC v. Hodel,* 624 F.Supp. at 1060. And, if grazing capaci-

ty specifications are not essential to a valid land use plan, they do not need to be included in an EIS that evaluates the plan and compares it to other alternatives. *Id.*

The NRDC also claims the district court erred in citing provisions of the "proposed action" alternative in the EIS in support of the final land use plan's validity. Our review of the record satisfies us, however, that the plan incorporated the "proposed action."